*EXHIBIT 1*

Image ID:
D00825692D01

**SUMMONS**

Doc. No.    825692

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha                    NE 68183

Denisha M Seals v. Board of Regents of the Univ. of NE

Case ID: CI 22     8612

TO:  Board of Regents of the Univ. of NE

**FILED BY**

Clerk of the Douglas District Court
11/07/2022

You have been sued by the following plaintiff(s):

Denisha M Seals

Plaintiff's Attorney:    John D Cartier
Address:                 PO BOX 5241
                         6401 'Q' St.,Ste. #100
                         Lincoln, NE 68505
Telephone:               (954) 319-9832

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Nebraska Supreme Court Rule 2-208 requires individuals involved in a case who
are not attorneys and representing themselves to provide their email address to
the court in order to receive notice by email from the court about the case.
Complete and return the attached form to the court if representing yourself.

Date: NOVEMBER  7, 2022    BY THE COURT:    _John M. Friend_
                                            Clerk

| Image ID:<br>D00825692D01 | **SUMMONS** | Doc. No.   825692 |
|---|---|---|

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

> Board of Regents of the Univ. of NE
> Attn: Board of Regents
> 3835 Holdrege Street
> Lincoln, NE 68583

BY:  Douglas County District Court
Method of service:  Certified Mail
Submitted Praecipe to Douglas district court, let me know if that will
 take care of notice. I plan on emailing a copy of approved complaint

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

| SERVICE RETURN | Doc. No.   825692 |
|---|---|

```
Douglas District Court
1701 Farnam
Omaha            NE 68183
```

To: Douglas County District Court
Case ID: CI 22    8612 Seals v. Board of Regents of the Univ. o

Received this Summons on _____,_____.  I hereby certify that on

_____, _____ at _____ o'clock __M. I served copies of the Summons

upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return      $ _____

Copy                      _____

Mileage ____miles         _____

   TOTAL               $ _____

Date: _____      BY: _____
                                        (Sheriff or authorized person)

## CERTIFIED MAIL
## PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

                              _____

Postage $ _____   Attorney for: _____

The return receipt for mailing to the party was signed on _____, _____.

```
To: Board of Regents of the Univ. of NE     From: John D Cartier
    Attn: Board of Regents                        PO BOX 5241
    3835 Holdrege Street                          6401 'Q' St.,Ste. #100
    Lincoln, NE 68583                             Lincoln, NE 68505
```

# ATTACH RETURN RECEIPT & RETURN TO COURT

Image ID:
D00825695D01

**SUMMONS**

Doc. No.   825695

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha                    NE 68183

Denisha M Seals v. Board of Regents of the Univ. of NE

Case ID: CI 22    8612

TO:  Joanne Li Dr.

**FILED BY**

Clerk of the Douglas District Court
11/07/2022

You have been sued by the following plaintiff(s):

    Denisha M Seals

Plaintiff's Attorney:    John D Cartier
Address:                 PO BOX 5241
                         6401 'Q' St.,Ste. #100
                         Lincoln, NE 68505
Telephone:               (954) 319-9832

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Nebraska Supreme Court Rule 2-208 requires individuals involved in a case who
are not attorneys and representing themselves to provide their email address to
the court in order to receive notice by email from the court about the case.
Complete and return the attached form to the court if representing yourself.

Date: NOVEMBER  7, 2022    BY THE COURT:    _John M. Friend_
                                                    Clerk

Page 1 of 2

Image ID:
D00825695D01

## SUMMONS

Doc. No.    825695

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

>        Joanne Li Dr.
>        201 Eppley Administration Building
>        6001 Dodge St.
>        Omaha, NE 68182

BY:  Douglas County District Court
Method of service:  Certified Mail

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

| SERVICE RETURN | Doc. No.   825695 |
|---|---|

```
        Douglas District Court
        1701 Farnam
        Omaha              NE 68183
```

```
To: Douglas County District Court
Case ID: CI 22    8612 Seals v. Board of Regents of the Univ. o
```

Received this Summons on _____,_____.  I hereby certify that on

_____, _____ at _____ o'clock __M. I served copies of the Summons

upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return      $ _____

Copy                      _____

Mileage ____miles         _____

    TOTAL               $ _____

Date: _____      BY: _____
                                       (Sheriff or authorized person)

# CERTIFIED MAIL
# PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

                                  _____

Postage $ _____      Attorney for: _____

The return receipt for mailing to the party was signed on _____, _____.

```
To: Joanne Li Dr.                    From: John D Cartier
    201 Eppley Administration Building     PO BOX 5241
    6001 Dodge St.                         6401 'Q' St.,Ste. #100
    Omaha, NE 68182                        Lincoln, NE 68505
```

# ATTACH RETURN RECEIPT & RETURN TO COURT

Image ID:
D00825696D01

**SUMMONS**

Doc. No.    825696

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha                    NE 68183

Denisha M Seals v. Board of Regents of the Univ. of NE

Case ID: CI 22    8612

TO:  Margarette Christensen Dr.

**FILED BY**

Clerk of the Douglas District Court
11/07/2022

You have been sued by the following plaintiff(s):

Denisha M Seals

Plaintiff's Attorney:    John D Cartier
Address:                 PO BOX 5241
                         6401 'Q' St.,Ste. #100
                         Lincoln, NE 68505
Telephone:               (954) 319-9832

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Nebraska Supreme Court Rule 2-208 requires individuals involved in a case who
are not attorneys and representing themselves to provide their email address to
the court in order to receive notice by email from the court about the case.
Complete and return the attached form to the court if representing yourself.

Date: NOVEMBER  7, 2022    BY THE COURT:    *John M. Friend*
                                                    Clerk

Image ID:
D00825696D01

## SUMMONS

Doc. No.   825696

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

        Margarette Christensen Dr.
        ATTN: M. Christensen-192 ASH
        6001 Dodge St.
        Omaha, NE 68182

BY:  Douglas County District Court
Method of service:  Certified Mail

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

## SERVICE RETURN

Doc. No.    825696

Douglas District Court
1701 Farnam
Omaha                    NE 68183

To: Douglas County District Court
Case ID: CI 22    8612 Seals v. Board of Regents of the Univ. o

Received this Summons on _____,_____. I hereby certify that on

_____, _____ at _____ o'clock ___M. I served copies of the Summons
upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return    $ _____

Copy                      _____

Mileage ____miles         _____

   TOTAL            $ _____

Date: _____    BY: _____
                                   (Sheriff or authorized person)

## CERTIFIED MAIL
## PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

                              _____

Postage $ _____    Attorney for: _____

The return receipt for mailing to the party was signed on _____, _____.

To: Margarette Christensen Dr.        From: John D Cartier
    ATTN: M. Christensen-192 ASH            PO BOX 5241
    6001 Dodge St.                          6401 'Q' St.,Ste. #100
    Omaha, NE 68182                         Lincoln, NE 68505

## ATTACH RETURN RECEIPT & RETURN TO COURT

Image ID:
D00825694D01

## SUMMONS

Doc. No.    825694

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha                    NE 68183

Denisha M Seals v. Board of Regents of the Univ. of NE

Case ID: CI 22     8612

TO:  Tracy Bridgeford Dr.

**FILED BY**

Clerk of the Douglas District Court
11/07/2022

You have been sued by the following plaintiff(s):

Denisha M Seals

Plaintiff's Attorney:   John D Cartier
Address:                PO BOX 5241
                        6401 'Q' St.,Ste. #100
                        Lincoln, NE 68505
Telephone:              (954) 319-9832

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Nebraska Supreme Court Rule 2-208 requires individuals involved in a case who
are not attorneys and representing themselves to provide their email address to
the court in order to receive notice by email from the court about the case.
Complete and return the attached form to the court if representing yourself.

Date: NOVEMBER  7, 2022    BY THE COURT:    _John M. Friend_
                                                    Clerk

Image ID:
D00825694D01

## SUMMONS

Doc. No.   825694

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

        Tracy Bridgeford Dr.
        ATTN:Tracy Bridgeford-BLDG 6001
        6001 Dodge St.
        Omaha, NE 68182

BY:  Douglas County District Court
Method of service:  Certified Mail


You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

| SERVICE RETURN | Doc. No.   825694 |
|---|---|

```
          Douglas District Court
          1701 Farnam
          Omaha            NE 68183
```

To: Douglas County District Court
Case ID: CI 22    8612 Seals v. Board of Regents of the Univ. o

Received this Summons on _____,_____. I hereby certify that on

_____, _____ at _____ o'clock ___M. I served copies of the Summons
upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return       $ _____

Copy                       _____

Mileage _____miles         _____

  TOTAL             $ _____

Date: _____    BY: _____
                                            (Sheriff or authorized person)

# CERTIFIED MAIL
# PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

                              _____

Postage $ _____    Attorney for: _____

The return receipt for mailing to the party was signed on _____,_____.

```
To: Tracy Bridgeford Dr.                From: John D Cartier
    ATTN:Tracy Bridgeford-BLDG 6001          PO BOX 5241
    6001 Dodge St.                           6401 'Q' St.,Ste. #100
    Omaha, NE 68182                          Lincoln, NE 68505
```

# ATTACH RETURN RECEIPT & RETURN TO COURT

Image ID:
D00825693D01

## SUMMONS

Doc. No.    825693

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha                    NE 68183

Denisha M Seals v. Board of Regents of the Univ. of NE

Case ID: CI 22    8612

TO:  University of Nebraska Omaha
DBA: ATTN: Stacia Palser

**FILED BY**

Clerk of the Douglas District Court
11/07/2022

You have been sued by the following plaintiff(s):

Denisha M Seals

Plaintiff's Attorney:    John D Cartier
Address:                 PO BOX 5241
                         6401 'Q' St.,Ste. #100
                         Lincoln, NE 68505
Telephone:               (954) 319-9832

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Nebraska Supreme Court Rule 2-208 requires individuals involved in a case who
are not attorneys and representing themselves to provide their email address to
the court in order to receive notice by email from the court about the case.
Complete and return the attached form to the court if representing yourself.

Date: NOVEMBER  7, 2022    BY THE COURT:    John M. Friend
                                                Clerk

Image ID:
D00825693D01

**SUMMONS**

Doc. No.   825693

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

      University of Nebraska Omaha
      3835 Holdrege Street
      232 Varner Hall
      Lincoln, NE 68583

Method of service:  Certified Mail

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

| | SERVICE RETURN | | Doc. No.    825693 |
|---|---|---|---|

Douglas District Court
1701 Farnam
Omaha                 NE 68183

To:
Case ID: CI 22    8612 Seals v. Board of Regents of the Univ. o

Received this Summons on _____,_____. I hereby certify that on

_____, _____ at _____ o'clock __M. I served copies of the Summons
upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return      $ _____

Copy                        _____

Mileage ____miles          _____

  TOTAL                $ _____

Date: _____    BY: _____
                                     (Sheriff or authorized person)

## CERTIFIED MAIL
## PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

                              _____

Postage $ _____    Attorney for: _____

The return receipt for mailing to the party was signed on _____,_____.

To: University of Nebraska Omaha       From: John D Cartier
    3835 Holdrege Street                     PO BOX 5241
    232 Varner Hall                          6401 'Q' St.,Ste. #100
    Lincoln, NE 68583                        Lincoln, NE 68505

## ATTACH RETURN RECEIPT & RETURN TO COURT

Filed in Douglas District Court
*** EFILED ***
Case Number: D01CI220008612
Transaction ID: 0019108662
Filing Date: 11/07/2022 01:37:19 PM CST

**IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA**

| | | |
|---|---|---|
| DENISHA M. SEALS, | ) | |
| PLAINTIFF | ) | CASE NO. CI 22-_____ |
| | ) | |
| VS. | ) | COMPLAINT |
| | ) | REQUEST JURY TRIAL |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY OF NEBRASKA, | ) | |
| UNIVERSITY OF NEBRASKA OMAHA,) | | |
| TRACY BRIDGEFORD, PHD., | ) | |
| JOANNE LI, PHD., | ) | |
| MARGARETTE CHRISTENSEN, PHD., ) | | |
| DEFENDANTS. | ) | |

COMES NOW, Plaintiff, DENISHA M. SEALS, by and through her attorney, John D. Cartier, and requests a trial by jury, and for her cause(s) of action against the Defendant(s), state and alleges as follows:

## I.   JURISDICTION

1. Plaintiff invokes this Court's jurisdiction under the Nebraska Fair Employment Practices Act ("FEPA") as this action is brought pursuant to Neb. Rev. Stat. §§ 48-1101 to 48-1125, and alleges that such jurisdiction is proper based on the allegations herein.

2. Plaintiff invokes this Court's jurisdiction pursuant to Title VII of the Civil Rights Act of 1964 as amended (42 U.S.C. §2000(e) et seq.("Title VII"), and alleges that such jurisdiction is proper based on the allegations herein, including unlawful discrimination, of which this Court has general and concurrent jurisdiction.

3. Plaintiff invokes this Court's jurisdiction pursuant to Title VI of the Civil Rights Act of 1964 as amended ("Title VI"), and alleges that such jurisdiction is proper based on the allegations herein, including unlawful discrimination, of which this Court has general and concurrent jurisdiction.

4. Plaintiff invokes this Court's jurisdiction pursuant to Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. 12131, and alleges that such jurisdiction is proper based on the allegations herein, including unlawful discrimination, of which this Court has general and concurrent jurisdiction.

## II.    PARTIES

5. Plaintiff, Denisha M. Seals, an African-American-woman, is a resident and citizen of Omaha, Douglas County, Nebraska and was at all times pertinent hereto, an "employee" of the Defendant(s) within the meaning of FEPA, Title VII, and Neb. Rev. Stat. § 48-1104.

6. Defendant Board of Regents of the University of Nebraska is a body corporate that exists and operates by virtue of the constitution and statutes of Nebraska.

7. Defendant University of Nebraska Omaha ("UNO") is a public institution of higher education governed and operated by the Defendant Board of Regents of the University of Nebraska with its principal place of business in Omaha, Douglas County, Nebraska.

8. Defendant Dr. Tracy Bridgeford was at all relevant times chairperson of UNO's English Department, and, was, accordingly, acting under state law and is sued in both her official and individual capacity.

9. Defendant Dr. Joanne Li was at all relevant times Chancellor of UNO, and, was, accordingly, acting under state law and is sued in both her official and individual capacity.

10. Defendant Dr. Margarette Christensen was at all relevant times Plaintiff's program supervisor, and, was, accordingly, acting under state law and is sued in both her official and individual capacity.

## III.    GENERAL ALLEGATIONS
### FIRST INCIDENT

11. On or about August 10th, 2020, Ms. Seals began working as a Teacher's Assistant ("TA") for the English Department at UNO.

12. Ms. Seals' supervisor for the program was Defendant, Dr. Margarette Christensen.

13. During the first week of the teaching assistantship, Ms. Seals completed a reflection paper for her pedagogy. On the paper in the comments, Dr. Christensen said to Ms. Seals, "Be sure to avoid overgeneralizing your assumptions about students, even if they present as 'white'." Attached hereto as **Exhibit A** and incorporated herein by reference.

14. In a conversation about the paper during the second week of the program, Ms. Seals expressed confusion to Dr. Christensen as to why she had these comments, as the paper nor the assignment had anything to do with race.

15. Dr. Christensen told Ms. Seals that she didn't write it based on other peers' comments; instead, she felt she needed to say that because Ms. Seals was more than likely going to be the "first black professor that they've ever had."

16. Dr. Christensen then told Ms. Seals that she wanted to make sure that Ms. Seals was not going to make them (her students) uncomfortable because she was a woman of color.

17. Dr. Christensen then told Ms. Seals that she was aware she was being hypersensitive to her pedagogy, but she was concerned of causing problems if either herself or students misunderstood Ms. Seals as a black woman.

18. Dr. Christensen then told Ms. Seals that, "this is not something that I really wanted to deal with later on." Dr. Christensen then again stated she didn't make these comments on any other student's papers because she was the only person of color as a TA.

## SECOND INCIDENT

19. During the third week of programming, Ms. Seals was asked to do a teaching demo by using selected articles Dr. Christensen had assigned them.

20. Ms. Seals chose Peggy McIntosh's *White Privilege: Unpacking the Invisible Knapsack*.

21. As a result of a hostile climate caused by Dr. Christensen, the assignment had gone horribly wrong.

22. Dr. Christensen had admitted she was extremely uncomfortable with a woman of color covering a subject on white privilege. She didn't want any of the students she was working with to do it for "obvious reasons."

23. Dr. Christensen spoke often of humanizing people but she often placed Ms. Seals in a category as a black woman.

24. Ms. Seals shares african and native heritage and identifies as afro-indigenous.

25. Dr. Christensen continuously interrupted Ms. Seals teaching demo.

26. Dr. Christensen admitted she did not interrupt another TA's teaching demo because she was "uncomfortable with (Ms. Seals)".

27. For this teaching demo, other TA's had selected topics covering race, normative standards, neurodiversity, and disability. One white male TA covered Crover. Dr. Christensen had applauded this TA for having the courage as a white man for doing the demo of white male privilege.

28. During Ms. Seals' teaching demo, Dr. Christensen admitted that she was continuously disrespected by the students.

29. Dr. Christensen then applauded Ms. Seals because of how shocked she was on her emotional intelligence to answer the disrespectful questions and kept her composure.

30. When in private, Dr. Christensen talked to Ms. Seals about the stereotype of the "angry black woman" as to why she was so surprised with her keeping her composure under the pressures of a classroom.

31. Dr. Christensen told Ms. Seals she was comfortable with teaching demos covering disabilities, neurodiversity, or a white male speaking on privilege, but she was uncomfortable with Ms. Seals as a black woman speaking on white privilege.

32. Dr. Christensen then told Ms. Seals that she came off as "arrogant" because of her wide vocabulary. She claimed that her white students may have an inferiority complex and may accuse her of condescension because of the stereotypes they may or may not have addressed within themselves, their families, or their communities about their thoughts regarding black women or black people.

33. Dr. Christensen continued on saying that because 9 times out of 10 Ms. Seals is going to be their first black woman teacher, and she did not want her to do this presentation on white privilege because it would be unfair to the white students and it would be unfair to herself (Dr. Christensen) to have to hear those complaints.

**INCIDENTS WITH OTHER TA'S AND FACULTY**

34. During the first day of the workshop presentation program, the TA group gathered to take a picture together.

35. During this time, a 2nd year TA named James told Ms. Seals, "Listen, you are going to have a really hard time here. And most people are going to make assumptions about you and make things really difficult."

36. James continued to say that he will be able to cuss at his students and use curse words in the way that he talks, but that she is unable to do the same because

she had to make sure she knew she couldn't do any of what they could do because "we are white."

37. James then told her that a couple people in the program were placing bets on how long Ms. Seals would last in the program because of how racist it was.

38. Around this time Ms. Seals also spoke with a professor named Alea Hall. In messages, Professor Hall said that Ms. Seals was being "targeted" and that the English department consisted of "white supremacists." Attached hereto as **Exhibit B** and incorporated herein by reference. Yet, the messages argued that Ms. Seals should stay because the only way systematic changes can actually happen is if she stays and endures the bullying with hopes of changing the system from within. Hall also confirmed there was a bet going around on how long Ms. Seals would last in the department.

39. In messages, Professor Hall states, "Look, I clearly have never had to navigate being a Black woman in that department, and I cannot imagine the emotional/physical/mental toll it probably takes to be there, but also consider how important you are to undergrad students who look like you. Not that you should not ever have to be the sacrificial lamb, but I personally believe English Departments are spaces of white supremacy, and until more people engage in those spaces, I don't know if it will change. Again, not fair that it has to be your experience nor is it your job to fix it."

40. Ms. Seals had worked incredibly hard to make it into UNO's English TA program. As a result of sexual abuse suffered while she was a child, Ms. Seals was diagnosed with PTSD during her undergraduate program. After all of these instances of discrimination within the department, as well as the comments by Dr. Christensen against Ms. Seals, Ms. Seal's diagnosed PTSD began to flare up to the point it was making her physically sick.

41. Ms. Seals' PTSD was in remission enough for her to be able to work. For the last seven years prior, she had been fighting to get back into school to finish her master's degree.

42. UNO was made fully aware of Ms. Seals diagnosis and challenges through administrative means and in her letter applying to the program. Attached hereto as **Exhibit C** and incorporated herein by reference.

**THIRD INCIDENT**

43. During one of Ms. Seals' presentations over her lesson plans, a white student in the TA group made a joke that caused the entire classroom to laugh at her.

44. The student went on to say that, as a white male, "I am so happy to be heterosexual so that I don't have to think about any of this. I don't care about any of this. I have one black friend who told me it's not even necessary for me to care about black issues because I'm not black. I'm just going to have to be honest with everyone in the class–including you, Denisha–but I really don't care. I read a lot of Toni Morrison and that is my subjective experience about race."

45. The entire class started clapping. Dr. Christensen then said, "I am so proud of you for acknowledging this, for speaking your mind; I am so proud of your growth. There wouldn't have to be conversations about Peggy Macintosh or Black Lives Matter if we had more white men like you to actually speak up about how they really feel about things."

46. Dr. Christensen then looked over at Ms. Seals and started to talk about how her pedagogical approach was existentially biased against white students, even though nothing that Ms. Seals included in her presentation was about white students.

47. Dr. Christensen then allowed classmates to continue to attack Ms. Seals' lesson plan.

48. Another student spoke up and said it would not be a good idea to do this plan because of the wide vocabulary and concepts she presented. It would come across as arrogant and unfair for her white students. Another one of the TAs went on to say, "I have to agree with her–you're going to come across as only empathizing with Black, Native Americans, and Latino students' experiences versus white people's experiences with racism. You're going to have to understand, Denisha, that everyone will make the assumption that you will automatically only emphasize with people of color because you are a BIPOC (Black, Indigenous, and people of color)."

49. Ms. Seals replied that she is not an acronym. Dr. Christensen then told Ms. Seals, "This demo is not for you to be defensive; it's for you to learn."

50. Dr. Christensen then emailed her own reflective comments and had everyone else email their thoughts about what she had to say.

51. Other TAs had been emailed reflective comments from the entire class after the duration of presentations, but in this instance, Dr. Christensen had the entire class respond to Ms. Seals immediately instead of waiting until after class to do it. Dr.

Christensen told Ms. Seals that she "needs to know how she is coming across and why it's not good".

52. Later, in a private meeting, Ms. Seals told Dr. Christensen that she hadn't allowed her to fully engage and teach like she did the other TAs. In response, she said, "I agree, Denisha–I was avoiding my own deficit thinking that you were addressing in your demo workshop. I interrupted you because I was just extremely uncomfortable. I have not attacked my own deficit thinking and it was very uncomfortable for me to challenge it. So that's why I can imagine how other students would feel about this subject. I don't want you introducing the materials to the students on the grounds that I, myself, am uncomfortable with it."

53. Dr. Christensen then requested that Ms. Seals redo her entire syllabus, telling her that she felt that it was too reflective on herself as a woman of color, and not reflective on what her white students would be comfortable with learning from a black woman.

54. When Ms. Seals met with Dr. Christensen that day to go over changes in the syllabus, Dr. Christensen ended up redoing the entire thing for her, eventually telling Ms. Seals that, "this is the syllabus I want you to do."

## FOURTH INCIDENT

55. On or about the second week of programming, Dr. Christensen asked all of TA's opinions on their first unit class articles, and whether they were optimistic or if they had a critique and why.

56. Dr. Christensen dismissed some students for a break, and proceeded to ask Ms. Seals to share her opinion on the article.

57. Ms. Seals said that her perspective was one of frustration over some of the articles because there was a lack of diversity within language, not color.

58. Ms. Seals said that for centuries people of color have been on the same topics in academia, but because of marginalization, we have to hear their perspective only by taking electives. This condition, Ms. Seals felt, was a consequence of eurocentrism and white supremacy ideology. She then stated how the education system was built from the perspective of individuals who identify with the system.

59. Dr. Christensen appeared to become angry listening to Ms. Seals perspective, and as students were returning back to the classroom, Dr. Christensen

told Ms. Seals that her perspective was not valid because she personally felt that all perspectives are already welcomed in academia at UNO.

60. Dr. Christensen went on to say that the white perspective is important to have, and without white perspective, it wouldn't be fair to only listen to other perspectives.

61. Ms. Seals replied that the problem is we only listen in academia when it comes to the white perspective and pointed to the class covering just Peggy Mcintosh who was discussing race from the perspective of a white person, but there was no focus on race from the perspective of another racial background.

62. Ms. Seals said, "I feel like when a white person speaks on our issues, that is why the light goes off for people to actually begin to care, or pretend to care enough about it."

63. Dr. Christensen said that the white perspective is more important because white people are in charge of the system. If they don't care, nobody else is going to care about when people like you are complaining.

64. At this point another TA student comments, "Even though we don't have any people of color within the units we are working on personally,  I think it's important for you, Denisha, to correct your own deficit thinking. Because without white allyship no BIPOC will be able to make an imprint on the system."

65. Ms. Seals responded, again, that she was not an acronym.

**FIFTH INCIDENT**

66. On or about the third week of programming, a fellow TA, Catherine, asked Dr. Christensen during class about UNO's policy on attire.

67. Dr. Christensen told them that everyone had autonomy and agency on how they dress.

68. Following  class that day, Ms. Seals went to Dr. Christensen's office during her lunch break.

69. Dr. Christensen then said to Ms. Seals, "I want to bring something to your attention regarding the clothing. I know I said I want everyone to have the autonomy and agency to be themselves, but I want you to look like a stereotypical teacher."

70. Ms. Seals asked Dr. Christensen what she meant by that, with which she replied, "Denisha, it's important that you carry yourself a bit differently."

71. Ms. Seals asked Dr. Christensen, again, what she meant by that, and she replied, "I would not recommend that you wear tight or form fitting clothing because you are young, pretty and attractive".

72. Dr. Christensen continued to theorize that an 18-year-old white male student would spend more time looking at Ms. Seals than learning. If he got an F or a D or didn't like the grade Ms. Seals had given him, he would then go to Dr. Christensen as Ms. Seals' superior with this complaint: "Well, I would have been able to do the work if Ms. Seals didn't have on a tight shirt."

73. Dr. Christensen then told Ms. Seals that even a regular cotton t-shirt with no bust line showing would be inappropriate. She stated that, as a black woman, she needs to be aware that black women have been historically sexualized by white men and that this would not be an issue for her if she followed the traditional dress code she was asking only Ms. Seals to adhere to.

74. Dr. Christensen told Ms. Seals that she cannot be personable with any of the white male students because she claimed that black culture "personalizes" people, and that Ms. Seals must not get to know her students outside of class.

75. She stated to Ms. Seals that she didn't feel a need to express this with other TAs because Ms. Seals's black culture is known to be "sexualized and more personable."

76. Dr. Christensen continued to explain that she didn't want an issue like this to come across her desk because she was already overwhelmed with her parents getting older and other things she has to do for the University. She then restated that Ms. Seals needs to be "uniquely mindful of how she carries herself around her white students."

77. Ms. Seals told Dr. Christensen that she felt ostracized, disrespected, and offended by these assumptions. Ms. Seals also told Dr. Christensen that she knew that (Denisha) had a fiance at the university. Dr. Chirstensen replied, "Denisha, I am just basing this off of historical things that I've noticed with black culture."

**SIXTH INCIDENT**

78. On or about August 23, 2021, Dr. Christensen met with Ms. Seals after her first day of class to work one-on-one on her weekly lesson plans. Dr. Christensen said that she felt she needed to manage this until Ms. Seals understood how Dr. Christensen wanted her to guide her students.

79. Dr. Christensen said that she gives her other student TAs autonomy and agency, because she knows there isn't a "racial or sexualized component to any potential complaints they may receive from their students if they are upset with their grades."

80. During this meeting, Ms. Seals shared that after class a Latino student had told her that she was the first person ever who reiterated his own lived experience and that her subjectivity would be valued, because that's expressly a part of her pedagogy.

81. Ms. Seals told Dr. Christensen that hearing this feedback meant the world to her.

82. In response, Dr. Christensen told Ms. Seals, "I've never had a student of color say that to me, and if I were you I wouldn't let it get to your head. You do not have a PHD; you are in here to get a masters. Let us see how he feels about you after you grade his first writing assignment."

83. Ms. Seals replied that she simply appreciated making someone feel validated.

**SEVENTH INCIDENT**

84. During the third week of the TA program, Dr. Christensen asked Ms. Seals about her lesson plans. Ms. Seals told her that she will introduce the normative lesson, break students into small groups, and have them respond to various articles and quotes on norms. Ms. Seals would then have the students visit the Black Studies, Native American, and various other multicultural departments.

85. Dr. Christensen said that she liked where Ms. Seals' heart was at, but that the latter would potentially make white students and individuals in those departments uncomfortable.

86. Ms. Seals told Dr. Christensen that she talked to individuals in these departments and that they were willing and excited.

87. Dr. Christensen then stated that she didn't want Ms. Seals to teach in this way, because her white students who don't have any experiences with people from multicultural communities may feel uncomfortable.

88. Dr. Christensen asked her to teach the same way that Katherine did (a white female TA) because she felt it was more safe. She reinstated that she didn't need any extra complaints on her desk.

**AFTERMATH**

89. As a result of being constantly put down by Dr. Christensen and some of the other TAs, in and out of a public setting, Ms. Seals' panic attacks started to get worse. The symptoms began flaring up on August 4th, but as time went on and the discrimination worsened, Ms. Seals' condition continued to deteriorate. Ms. Seals began having nightmares, and as a result, her psychiatrist increased her medication.

90. By the third week, Ms. Seals requested to do the Tuesday evening TA classes over Zoom because her anxiety attacks were making it impossible for her to attend in person.

91. During one of these evening classes Ms. Seals attended, Dr. Christensen asked for opinions again, and proceeded to yell at Ms. Seals after she gave her opinion. She told her, "It's not like you're teaching anybody anything. Nothing you have to say is profound. It's not like you are giving this 'holy black perspective', because you are really not saying anything that has substance."

92. Everyone Ms. Seals spoke with in the department acknowledged it was a hostile climate towards persons of color, and in particular towards Ms. Seals, but they all reiterated that she needed to deal with it "or they will make your life worse."

93. James, the second year TA, told Ms. Seals that she was in the department for "DEI (diversity, equity, and inclusion) reasons." He went on to explain that this was because the English department is under a lot of criticism for not having any black majors, TAs, or instructors.

94. James also encouraged Ms. Seals to find white allies to speak for her so that she doesn't come across as "an angry black woman" .

95. Ms. Seals then met with Professor Alea Hall. Professor Hall confirmed the pattern of abuse that she had witnessed Dr. Christensen levy on other students of color. Professor Hall also encouraged Ms. Seals to stay and be a martyr to change the system.

96. Professor Hall told Ms. Seals to "think of this as an ego thing. They are treating you this way to break you down. Take it as a compliment that they are trying to intimidate you."

97. Ms. Seals also spoke with another English instructor, Aero Rogers. Ms. Seals told Professor Rogers of all of the things that were happening to her. Professor Rogers stated that she was not surprised by any of Ms. Seals' experiences, because she believed the university was hypocritical to the true needs of students of color due

to their refusal to properly train white students and faculty to be tolerant and open. She then told Ms. Seals some of her experiences as a homosexual professor. Professor Rogers told Ms. Seals that it is important to not "piss off" Dr. Christensen or Dr. Bridgeford because they hold grudges. She also told her to not tell her fiance, who is a full-time faculty member, claiming that it could turn into a sticky, problematic situation because "these white racists in the department are the ones who are grading" Ms. Seals' work, and not the professors in the other departments.

98. Professor Rogers expressed that she was an ally to Ms. Seals, but she was not comfortable speaking up because staff were still angry at her for correcting a homophobic student's behavior towards her.

99. On August 25th, Ms. Seals walked into UNO's writing center and joined two other white student TAs at a table. They all began discussing dynamics of the first week of class. Ms. Seals shared her negative experiences with the program and Dr. Christensen. The second year TAs all validated her experiences. They said they witnessed the things people were saying to Ms. Seals. One of the TAs also commented that their black friends dropped out of UNO because of the racist climate.

100. The TAs then commented that they knew Ms. Seals' fiance is a full-faculty member at Black Studies. They told Ms. Seals, "whatever you do, do not tell your fiance or anybody in the multicultural departments, because it would then be a department of color going against a department of white people and she would be responsible for that".

101. Around this time, Ms. Seals had a discussion with the English Department Chair, Dr. Tracy Bridgeford. Dr. Bridgeford told Ms. Seals that she would not be able to help her because the more "traditional" students would view this as Ms. Seals "brown-nosing". Dr. Bridgeford also feared that these students would make unfair assumptions that she only favored Ms. Seals because she was the sole BIPOC first-year TA.

102. Dr. Bridgeford told Ms. Seals that she had brought her into the department, but she was not going to be able to be an ally for her. She told Ms. Seals, "Do not come to me for help."

103. That same day, Ms. Seals went to the Office of Latino/Latin American Studies ("OLLAS"). Three women were eating at a table, including a women named Eurico whom Ms. Seals had known for a long time. When they asked Ms. Seals how

she was doing, she started crying and began sharing her experiences. Ms. Seals told them she was going to quit because she felt alone.

103. Ms. Seals said that she had been repeatedly told that she should not share these experiences with her fiance. Eurico agreed with that, and suggested she may consider going to Dr. Juan Casas as he was the director of graduate studies. Eurico then said there still may be a problem with going to Dr. Casas, saying, "You know how it is when people of color get into positions of power. He will be in a situation where it looks like the Latino is protecting the black student who is being disrespected, even though it is his job." Eurico then reiterated to Ms. Seals, "Don't make Dr. Casas feel uncomfortable and don't put him in this situation by telling him anything."

104. Eurico told Ms. Seals that she agreed with the TA who told her to find white allies to help her handle these situations.

105. Eurico then suggested Ms. Seals go to Dr. Ramón Guerra, who was a Latino professor in the English department. Eurico told Ms. Seals to try to gain him as an ally, but to be careful of it turning into the same situation as going to Dr. Casas. because Dr. Guerra was not even comfortable handling a situation such as the one Ms. Seals is going through due to his own experiences at the university. Eurico shared some of these experiences with Ms. Seals and ultimately advised her to avoid him entirely and find white allies instead.

106. Following this conversation, Ms. Seals decided she needed to walk away from the program. She then went to her fiance and told him what was happening.

107. Over the course of three weeks, Ms. Seals had lost 15 pounds. She wasn't able to eat. Her psychiatrist increased her medication because she thought Ms. Seals had suicidal ideation due to her feelings of loneliness and worthlessness.

108. Ms. Seals drew major comparisons between her situation at the university and her experience being raped as an adolescent, of which subsequently triggered her PTSD. She felt this way because in both experiences people were telling her that they knew what was happening and that it was wrong, but no one was going to defend her; she had to deal with it by herself. This was a direct comparison to Ms. Seals' experience growing up—being subjected to repeated rapes with no adults willing to help.

109. Ms. Seals' psychiatrist told her that she was not well anymore.

110. Her psychiatrist told Ms. Seals that it was time for her to leave the program due to her physiological response to her negative experiences at the university.

111. On or about August 25, 2020, Ms. Seals stepped down from the Critical and Creative Thinking Program as well as the Advanced Writing Graduate Program.

112. As a result of the discrimination and abuse, she was forced back to where she originally was in dealing with her trauma years prior to joining UNO's program.

113. If Ms. Seals tried to go to another university to obtain her degree and work as a TA, they would ask why did she step down, or why did this happen?

114. Ms. Seals wrote a letter expressing her frustration over how she was treated the Sunday after leaving the program. She forwarded it to the board of regents, the chancellor, and tagged instructors and professors who had played a part in these incidents. Attached hereto as **Exhibit D** and incorporated herein by reference.

115. In response to the letter, Chancellor Joanne Li apologized via email for Ms. Seals' experiences, saying that she was sorry that these things happened to her.

116. After the statement from Chancellor Li, the university cut off all communication with Ms. Seals. Soon after, Ms. Seals received messages from others at the university that faculty members were planning to meet with and convince Ms. Seals' fiance to keep her from suing the university.

117. After this, Ms. Seals confided in her fiance, Dr. Nikitah Okembe-RA Imani, of the entire chain of events and her decision to leave the university. Dr. Imani then wrote to the University on September 25, 2021 expressing his displeasure over how Ms. Seals was treated during her time as a TA. Attached hereto as **Exhibit E** and incorporated herein by reference.

118. Ms. Seals received other messages from faculty and staff at the university, but they did not want to stick their necks out for her.

119. Additionally, the defendants did not accommodate Ms. Seals diagnosed ADHD. Attached hereto as **Exhibit F** and incorporated herein by reference.

120. On or about the second week of programming, Ms. Seals met with the Accessibility Office requesting assignment extensions due to her ADHD. The Accessibility Office told Ms. Seals that they can't force teachers to accommodate; they could only encourage them to accommodate. This stance by the Accessibility Office is incorrect and against federal law. As a result of inaction by the Accessibility Office,

Ms. Seals was never granted accommodations for her ADHD. On August 10, 2021, Dr. Imani wrote a letter to the University addressing this noncompliance. Attached hereto as **Exhibit G** and incorporated herein by reference .

121. Plaintiff has timely and properly exhausted all administrative remedies, was granted a right to sue by the Nebraska Equal Opportunity Commission, and has timely filed suit. Attached hereto as **Exhibit H** and incorporated herein by reference.

122. As a proximate result of the entirety of the above-described actions, Ms. Seals has suffered severe loss of professional achievement, shame, mortification, humiliation, severe emotional distress and anguish, and other injuries. Plaintiff seeks equitable relief from general, compensatory, special, and punitive damages according to proof and said discriminatory actions taken by the Defendants with malice and reckless disregard of Plaintiff's right to be free from unlawful discrimination. Plaintiff's damages are ongoing and Plaintiff continues to suffer emotional distress and emotional anguish.

## IV. FIRST CAUSE OF ACTION (RACIAL DISCRIMINATION UNDER FEPA)

123. Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 122 above as fully set forth herein.

124. Defendant's actions constitute violations of the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. §§ 48-1101 to 48-1125, the Nebraska Fair Employment Practices Act ("FEPA").

125. Plaintiff was forced to step down because of serious health complications that were caused by Defendant's intentional and unlawful conduct. These repeated instances of discrimination constitute unlawful discrimination under Neb. Rev. Stat. §§ 48-1101 et. seq., and as direct and proximate result of UNO's violations of FEPA, Plaintiff has suffered and is still suffering damages including, without limitation, actual and consequential damages for economic loss.

126. As the direct and proximate result of UNO's and named defendants' violations of FEPA, Plaintiff has suffered substantial non-economic damages, including and without limitation, emotional and physical suffering and distress, humiliation, and intangible injury for the deprivation of her rights.

## V. SECOND CAUSE OF ACTION (DISCRIMINATION UNDER TITLE VII)

127.  Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 122 above as fully set forth herein.

128. Defendant's actions constitute violations of Title VII of the Civil Rights Act of 1964 as amended (42 U.S.C. §2000(e)-2(m) et seq.)

129. Plaintiff was subjected to unlawful treatment by UNO, in that UNO had knowledge of, and failed to correct, discriminatory practices committed against Plaintiff.

130. The unlawful discriminatory practices to which Plaintiff was subjected included the acts of disparate treatment alleged above.

131. The conduct of UNO and other named defendants was intentional and in reckless disregard to Plaintiff's rights under clearly established federal law.

132. Defendants' actions segregated and classified the Plaintiff on the basis of her race, and as a result deprived the Plaintiff of employment opportunities. This constitutes unlawful discrimination under Title VII of the Civil Rights Act, and as direct and proximate result of UNO's violations of Title VII, Plaintiff has suffered and is still suffering damages including, without limitation, actual and consequential damages for economic loss.

133. As the direct and proximate result of UNO and named defendants' violations of Title VII, Plaintiff has suffered substantial non-economic damages, including and without limitation, emotional and physical suffering and distress, humiliation, and intangible injury for the deprivation of her rights.

## VI.  THIRD CAUSE OF ACTION (DISCRIMINATION UNDER TITLE VI)

134.  Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 122 above as fully set forth herein.

135. UNO is an entity receiving federal financial assistance.

136. Plaintiff was subject to unlawful treatment by UNO, in that UNO had intentionally discriminated against Plaintiff on the basis of her race and skin color. UNO did not sufficiently monitor or prevent the discrimination, as well as failed to adequately respond to Plaintiff's complaints. UNO and named Defendants had knowledge of, and failed to correct, discriminatory practices committed against Plaintiff.

137.  As the direct and proximate result of UNC's violations of Title VI, Plaintiff has suffered substantial damages including, without limitation, actual and consequential damages for economic loss.

## VII.    FOURTH CAUSE OF ACTION (DISABILITY DISCRIMINATION FEPA)

138.  Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 121 above as fully set forth herein.

139. Defendants' actions constitute violations of the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. §§ 48-1101 to 48-1125, the Nebraska Fair Employment Practices Act ("FEPA").

140. Defendants' actions, including not accommodating Plaintiff's PTSD disability by worsening symptoms due to discriminatory practices and overall hostile work environment constitutes unlawful discrimination under Neb. Rev. Stat. §§ 48-1101 et. seq., and as such Plaintiff has suffered and is still suffering damages including, without limitation, actual and consequential damages for economic loss.

141. Defendants' actions, including not accommodating Platinff's ADHD disability constitutes unlawful discrimination under Neb. Rev. Stat. §§ 48-1101 et. seq., and as such Plaintiff has suffered and is still suffering damages including, without limitation, actual and consequential damages for economic loss.

142. Additionally, as the direct and proximate result of UNO's and named defendants' violations of FEPA, Plaintiff has suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury for the deprivation of her rights.

## VIII.    FOURTH CAUSE OF ACTION (DISCRIMINATION UNDER ADA)

143.  Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 121 above as fully set forth herein.

144. Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. 12131 and its implementing regulation, 28 C.F.R. Part 35. Title II prohibits discrimination on the basis of disability by public entities. Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 United States Code (U.S.C.) 794, and its implementing regulation, 34 Code of Federal Regulations (C.F.R.) Part 104, Section 504 prohibits discrimination on the basis of disability by recipients of Federal Financial Assistance (FFA). Defendant

UNO is a public university and a recipient of federal financial assistance and is therefore bound by Title II of the Americans with Disabilities Act Section 504 of the Rehabilitation Act.

145. Pursuant to the above-stated statutes, the Plaintiff filed a complaint with the Nebraska Equal Opportunity Commission in which she alleged, among other things, that UNO discriminated against her and was a violation of the American with Disabilities Act and the Rehabilitation Act of 1973.

146. The court now has jurisdiction over this matter under 42 U.S.C. § 12131 to 12133 and 29 U.S.C. § 794(a). Plaintiff is a qualified individual with a disability within the meaning of all applicable statutes, including the above-stated statutes. Defendants have discriminated against the Plaintiff on the basis of her disability by failing to accommodate Plaintiff's disability, by failing to reasonably accommodate the Plaintiff's disability and by otherwise failing to follow the policies and procedures adopted by the Defendants. Furthermore, the Defendants' conduct and action and inactions previously described have violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

147. As the direct and proximate result of UNO's and named defendants' violations of ADA, Plaintiff has suffered substantial non-economic damages, including and without limitation, emotional and physical suffering and distress, humiliation, and intangible injury for the deprivation of her rights.

## IX.   FIFTH CAUSE OF ACTION (DISCRIMINATION UNDER § 20-148)

148.  Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 121 above as fully set forth herein.

149. To the degree this court determines Defendants were acting under their own authority as private individuals and not as a sovereign entity, the Defendants' actions constitute a violation of Plaintiff's rights under Neb. Rev. Stat.  § 20-148, as the Plaintiff has been deprived of rights protected under the United States Constitution and/or the laws of the State of Nebraska.

150.  As the direct and proximate result of UNO's and named defendants' violations of Neb. Rev. Stat. § 20-148, Plaintiff has suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury for the deprivation of her rights.

### X.    SIXTH CAUSE OF ACTION (HOSTILE WORK ENVIRONMENT)

151.  Plaintiff refers to and incorporates by reference each and every allegation of Paragraphs 1 through 121 above as fully set forth herein.

152. Plaintiff, as a member of a protected class, was subject to repeated instances of harassment that disregarded and disrespected Plaintiff's human dignity by the Defendants.

153. The discrimination suffered by Plaintiff was illegal discrimination based on her race and skin color.

154. The main perpetrator, Dr. Christensen, repeatedly demonstrated a bias and stereotyped Plaintiff on the basis of her race. These instances of discrimination were so severe and pervasive that they affected Plaintiff's health and well-being to the point that her psychiatrist advised her to leave the program in order combat further deterioration of her mental and physical health.

155. As the employer of Dr. Christensen, both the Board of Regents and UNO are also at fault for not preventing or stopping the discrimination suffered by Plaintiff.

156. Among other instances of discrimination, students were placing bets on how long Plaintiff would last at the university as well as being repeatedly told to not to tell anyone what was happening. These instances fostered a hostile work environment that the employer did not sufficiently monitor or prevent, as well as failing to adequately respond to Plaintiff's complaints.

157. As the direct and proximate result of UNO's and named defendants' actions creating a hostile work environment, Plaintiff has suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury for the deprivation of her rights.

### XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief against Defendant(s) as a result of the Plaintiff's Cause of Actions under FEPA, Title VII, and/or Neb. Rev. Stat. § 20-148, a judgment in favor of the Plaintiff and against the Defendant(s) that will do the following:

A.  Award of compensatory money damages of $300,000 for discrimination under Title VII and/or Title VI;

B.  Award of compensatory money damages of $300,000 for discrimination under the ADA;

C.  Adequate compensation for general and special damages, including an award of backpay, including interest thereon to compensate Plaintiff for loss of salary, fringe benefits and other economic losses, emotional distress and mental anguish;

D.  Award of Attorney's fees and expenses incurred in pursuing this case as the court deems appropriate and pursuant to 42 U.S.C. § 1988;

E.  Any other further relief this Court deems just and proper; and,

F.  That allows for all over recoverable elements of damages, together with any punitive damages, attorney fees, court costs, and for such other relief that the court deems just and equitable.

**DENISHA M. SEALS, Plaintiff**

BY:     /s/ *John D. Cartier* /s/

John D. Cartier #26307
Cartier Law
PO Box 5241
Lincoln, Nebraska 68505
(954) 319-9832
johncartierlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on Monday, November 7, 2022 I submitted a Praecipe to the Douglas District Court to send via first class mail a true and correct copy of the Complaint, Summons, and Exhibits to the following:

1.      Board of Regents of the University of Nebraska

        University of Nebraska System

        Attn: Board of Regents

        3835 Holdrege Street

        Lincoln, NE 68583-0745

        corpsec@nebraska.edu


2.      University of Nebraska Omaha

        ATTN: Stacia Palser

        3835 Holdrege Street, 232 Varner Hall

        Lincoln, NE 68583-0745

        slpalser@nebraska.edu


3.      Dr. Tracy Bridgeford

        Univ. of Nebraska at Omaha

        ATTN: Dr. Tracy Bridgeford-BLDG 6001

        6001 Dodge St. Omaha, NE 68182

        tbridgeford@unomaha.edu


4.      Dr. Joanne Li

        Office of the Chancellor

        201 Eppley Administration Building

        6001 Dodge St. Omaha, NE 68182

        unochancellor@unomaha.edu


5.      Dr. Margarette Christensen

        Univ. of Nebraska at Omaha

        ATTN: Dr. Margarette Christensen-192 ASH

        6001 Dodge St. Omaha, NE 68182

        mchristensen@unomaha.edu


Once the Complaint is accepted by the court, I shall also submit via email a copy to the above named defendants.

/s/ John D. Cartier /s/

John D. Cartier #26307

Cartier Law

PO Box 5241

Lincoln, Nebraska 68505

(954) 319-9832

johncartierlaw@gmail.com

Denisha Michele Seals

English 8020: College Writing Instruction

Professor: Dr. Margarette Christensen

Fall 2021

Reflection Paper

*Great work! Thanks for your thoughtful reflection here*

I spent some time reflecting on the first week of the workshop class, on the group interactions with my peers, and the assigned reading materials. Two central questions arose "What does it mean to read" and "Is reading comparable to the social interactions we have with one another?" My take-away is the need to optimize my students' abilities for receptiveness to new ideologies and to the application of sympathy towards authors' perspectives. For example, while, presenting and discussing reading materials with first-year undergraduate students it is essential to teach them the significance of comprehending what they are reading instead of memorizing text.

In my pedagogy, I intend to first explain the dynamic ways of reading and comprehending, introducing the perspectives of authors, helping students with the process of connecting lived experience to these perspectives, and giving them the opportunity to develop their own conclusions about the material. Students traditionally have been trained to memorize. I propose to introduce them to the application of their agency as college students, actively internalizing the words given to them (assigned reading) and making the authors' stories their own. *(or at least having a more open perspective)*

I believe it is important to challenge students with in-class activities throughout the week, aimed at increasing their vocabulary, applying new words they have learned in class in the writing assignments. I could do this, for example, by giving "words of the day" or "quotes of the day" or by having them "free write" at the beginning of a class period, encouraging them to integrating newly learned words into their responses.

My teaching persona is an outgrowth of my personality, cultural consciousness, and educational experience. I am a spiritual empath, socially assertive, globally receptive, but simultaneously critically aware of the importance of an instructor establishing boundaries. The first day of class I plan to introduce myself and explain how I expect to be addressed in class. I believe in the importance of instilling in my students the understanding that I am there to teach and that they are there to learn. *guide, coach, help* *write, participate, practice.*

Among the questions I am exploring within myself as I consider the initiation of my teaching experience are whether: Will students will be apprehensive to the idea of "breaking down boxes?" Will I be able to affectively elucidate that we have been conditioned to create prejudices in lieu of understanding "others?" Do I need to give examples of how I challenged my own deficit thinking? Can I entice their desire to construct ideas and responses creatively, directly, and concisely to the reading materials and activities I will present? *YES!*

*Be sure to avoid overgeneralizing your assumptions about students, even if they present as "white." I know you know this; I just wanted to remind you...*

**EXHIBIT A**

1:55 ⓦ ☁☁ 6⁸ ⚭ ⓦ          📶 99% 🔋

← Alea                    📹  📞  🔍  ⋮

Texting with Alea (SMS/MMS)


**A**  Hey! It's Alea

Everything that you said why you are not at UNO is why I'm leaving!

Shit. I'm so sorry.

I stupidly always hope that other people will have different experiences.

**A**  Have you officially withdrawn yet?

Yes, I'll be writing a letter of grievances.

 reflection...vise.docx
14.76 KB

Quick question is this attacking white people? Because I don't see it nor does anyone else.

Look, I clearly have never had to navigate being a Black woman in that department, and I cannot imagine the emotional/physical/mental tole it probably takes to be there, but also consider how important you ⬇ ) undergrad students who look like you. Not

⊕  🖼  Text message          ☺  🎤

# EXHIBIT B
# PAGE 1 OF 10



Look, I clearly have never had to navigate being a Black woman in that department, and I cannot imagine the emotional/physical/mental tole it probably takes to be there, but also consider how important you are to undergrad students who look like you. Not that you should not ever have to be the sacrificial lamb, but I personally believe English Departments are spaces of white supremacy, and until more people engage in those spaces, I don't know if it will change. Again, not fair that it has to be your experience nor is it your job to fix it.



I will say this, consider getting your MA and potentially teaching a a community college. There are many of the same issues, but there is an enormous tone shift and at least an openness and effort to address these types of structures.



Alea,
I do NOT have the "privilege" to cover my "blackness" or culture like you do. You can blend in and stay silent and get through. I cannot.

**EXHIBIT B
PAGE 2 OF 10**

   Text message  




Hey, just thought you might like to chat on the phone. No pressure





It already started in August 12th

It was bad!



EXHIBIT B
PAGE 3 OF 10

  Text message  



1:57 📶 98%

← Alea

Wow. I also don't get why white people can't fucking listen when BIPOC tell them about oppression.



Exactly, she's in your department now?

My guess is they hired her to be the white expert in Black pain. So many levels of gross

Exactly, she actually told me she knows better than me

The fact that she went yo your page to "school" you and you're not even Facebook friends is disturbing

Exactly, example of what I've been dealing with

You're being targeted and bullied because you're a Black woman who's telling the truth.

Exactly, she told me that she's an ally to me and I'm not receptive of her role 🙄 nuts!

Text message

**EXHIBIT B
PAGE 4 OF 10**





**EXHIBIT B
PAGE 5 OF 10**

1:58

← Alea

There are a few things in the mix for me. One being that I was just a witness in a rape trial, and it took a lot of out me.

I have, at times, debilitating, mental health issues. I have four jobs and work 80 hours a week,  and still don't have health insurance.  I have a rare numerological disorder, and unfortunately, stress brings on episodes that land me in the hospital and ER. Things are complicated for me and my health is precarious. And I fucking hate this and capitalism, but I need that job right now. I don't really discuss these issues that much, but they are my reality.

My partner is currently in another country and I don't have the luxury of two incomes/in-person support right now.

I believe and support you. I also have to start taking care of my health and not sacrificing myself. If I had resources and stable income where every penny didn't count, and health insurance, it would be a different story.

But let me talk to my therapist so I can see if I ca___ ___ure out a way this doesn't dis___ me, but still support you

**EXHIBIT B**
**PAGE 6 OF 10**

   Text message  



**EXHIBIT B**
**PAGE 7 OF 10**



**EXHIBIT B**
**PAGE 8 OF 10**






1:56

← Alea



This picture shows how I truly did not fit in with anyone.

**A** God. I hate them.

**A** You look uncomfortable. It's heartbreaking.

My heart is broken. Now I need to figure out a job to help with bills. I'm accepting donations lol

Here's my availability for next week:
Wednesday 2-5; Friday 11-2 pm. I know that's not a lot but I currently have 4 jobs, so it's a bit crazy.

**A** Have you heard of Kara Walker?

Yes

Let's meet Friday

↓

**A** Ok, what time works for you?

**EXHIBIT B**
**PAGE 9 OF 10**

   Text message  

1:58

← Alea

Hi how are you? Can you write a letter of support?

**A** Sure, but I will need a week to write it as my schedule is pretty crazy. For what job are you wanting the letter?

Send me your resume/ job experiences to aehall|unomaha.edu

Also, keep in mind, I may not be the best person in terms of speaking to you work history, as I have never worked with you. I can speak to your character and my interactions with you though.

My complaint letter to the University

**A** Ah. Ok, what do you want me to say?

Letter of support talking about my character and that you've seen firsthand the racial and sexism from your experiences..... essentially an ally letter

How do you feel about what I shared with you

Text message

**EXHIBIT B**
**PAGE 10 OF 10**

Statement of Purpose:

Growing up, I lived with my mother, a single parent, who had not had a childhood. She was a teenage mom and was in an abusive relationship with my dad. When she left him, she started to live the life she never had. My mother began to party and drink excessively. Unfortunately, the unresolved problems from her past were projected on me from the time I was very young. I believed I was of no value to anyone, which left me with low self-esteem and vulnerability to people who exploited my innocence. Sexual abuse left me confused and empty inside. At age 9 after years of constant abuse, I was sent with my sister to foster care where I learned that I needed to be tough. My sister had a disability that made her an easy target for physical abuse by the other children, so I felt I had to protect her.

In foster care, I was separated from my sister and never in any particular school for more than a month. This instability left me feeling unwanted everywhere I was placed.  As time went by, I slowly began falling through cracks in the educational system. One day in high school a teacher told me, "You're not the smartest out of the bunch, but you're a strong person." I would think to myself, what made her say that remark to me with such confidence? I decided from that point on I had a choice: to continue to hurt and to follow my mother's path, expecting the hurt in her life, or to start my healing process. I began to go counseling and realized that the horrible childhood I had was not my fault, and that learning to love myself with all my flaws was a priority, along with taking charge of my life. I began to stay after school with the teacher who had made the remark about my intelligence and strength. I built a strong relationship with her, realizing that her comment was her way of pushing me to see my potential. I learned that I could overcome adversity; I learned more independence. I could rely on myself, even if I had no one else.

**EXHIBIT C**
**PAGE 1 OF 2**

I began to reach out to other people at the high school and in the community who could help me prepare for college. I realized that I had value and began to identify with what I could bring to this world, once the positive people who were in my circle helped me find my confidence. After graduating from high school, I stepped onto the University of Nebraska at Omaha's campus as a first-generation college student who has the power to be a successful, intelligent, young woman. Since then, I became a part of the two percent of college students who study abroad. I have studied abroad in Spain and Argentina, and I am thankful to those who did not give up on me.

Why do I want to teach English? I am an African and Native American woman. My root, established in these two sociocultural traditions, causes me to believe that encouraging students towards find their own inner narrative voices and incorporating these into their writing will resonate with them intellectually and emotionally. With hope, they will encourage others towards a similar kind of creative, textual, self-revelation, fomenting positive changes in themselves and in their social world.

I became a successful college student by forging important mentoring relationships with my teachers and community members. I look forward to building a similar kind of support infrastructure with department members as I enter the realm of undergraduate teaching. Being able to share some part of my own experiences with undergraduates and contributing to their growth along their own educational paths in the classroom is but a plus.  I believe this teaching opportunity has the potential to improve my own active learning and I sincerely hope to have a chance to explore those possibilities.

**EXHIBIT C**
**PAGE 2 OF 2**

I recently was forced to withdraw from the Advanced Writing Graduate Certificate Program. My experience was characterized by constant reminders in word and deed that I was not to be considered a regular and equal citizen of the program. Throughout my brief tenure, I was reminded constantly that I was "black" and that my being "black" meant that I had to be micromanaged and engage special "accommodations" in order to function.

I encountered this initially with Dr. Tracy Bridgeford, chairperson of the English Department. I reached out to her to thank her for informing me about the open Teaching Assistantship Position in her department. I requested a meeting to give her a "thank you card" as a way to extend my gratitude. She responded by telling me I was being highly inappropriate and that I was crossing academic boundaries. She said she wasn't interested in personally or professionally getting to know me. I replied by extending my apologies if I had offended her and told her that my actions came out of my culture. I was baffled and confused because Tracy was a Facebook friend and had given me her personal cell-phone number to reach her. I decided to call her to clarify the terms of these "boundaries" and she told me that the faculty and staff at the university could perceive her accepting any gift as a form of favoritism and as "brown-nosing" so it was best to hold off on some of my cultural practices for that reason.

On the first day of the TA Seminar Workshop, Dr. Margarette Christensen spoke on her pedagogy of humanizing students to understand their lived experiences and culture(s). She then asked the class to share any of our experiences of any cultural misunderstandings that would have never happened if the person "humanized" us. I shared with her, and the workshop class the unnerving interaction I had had with the chair about my gift offering. Dr.Christensen stated that she believed that the chair did not handle the situation appropriately. She went on to say that as a "black" woman in academia, I will have cultural agency and autonomy, so it wasn't necessary to "hold off" on any cultural norms I was raised to live by. At that time, I was relieved to find that my cultural subjectivity was apparently being appreciated. Unfortunately, I later discovered that Dr. Margarette Christensen was hypocritical with respect to the process of humanization of students herself.

She assigned a first week completion reflection paper, guiding us with a series of questions on how to describe our teaching personas, our personal pedagogies, and asked whether we had any concerns. When I received my graded reflection paper back, I was completely baffled by her comments. She stated, "Be sure to avoid overgeneralizing your assumptions about students, even if they present as "white." I know you know this; I just wanted to remind you." I asked her in class why she wrote that comment on my paper and whether she had written the same comment on any of my peers' papers? She said, "No, I don't feel that I need to do so for obvious reasons. You are more than likely going to be the first "black" instructor these first-year students have ever had, and I want to be sure they do not feel outed in any way by assumptions you will make about them." I told her that my reflection paper had absolutely nothing to do with race. I also stated that I was offended that she made the assumption that I would place presumptive labels on any of my students, including "white," when that would contradict my entire pedagogy. She said she understood and that she was just being hyper-sensitive to any student misinterpreting me as a "black" woman, which could cause problems for me later on. The second incident with Christensen was more frustrating than the first. The TAs in the seminar workshop were required to present a teaching demo based on the unit one articles we

**Exhibit D**
**Page 1 of 6**

read and discussed in class. She stated we could choose any of the articles.  I chose to teach Peggy McIntosh "White Privilege" article. I began my presentation by asking each TA to take 5 minutes to respond to some questions. "If you had to change places and live the life of someone from one of the many marginalized groups in society, do you think you could cope? Why or why not?" I was promptly interrupted by Christensen, who said that she immediately thinks of disabled people as marginalized, not people of color. I was going to resume explaining the writing prompt, but she interrupted me again saying, "What if you have people of color in the class?  How could they do this assigned prompt, too, so that "white" students would not feel outed?"  I attempted to continue again, this time in the case where students in my class were "nonwhite." asking whether they could cope with living as a person with privilege. Christensen THEN states that she probably should have let me finish before she jumped to conclusions. As

I moved on through the next steps of my lesson plan, A "white" male student opined that he was happy to be a heterosexual white male, arguing that as a result, he didn't have to think about race, about his privilege, and that he had one "black" friend, and that all he knew about "black" people was from what he had read from Toni Morrison. Christensen praised him for being so open and honest about his subjective experiences. Overall, she told me that she felt that this was not a "good way" to begin the semester with my students, because it could cause them to drop out of my class. She considered it a bad idea to force them to critically think early in the semester.

Christensen's opening of the door to the critique that somehow my pedagogical approach was somehow existentially biased against "white" students, an inherently unfounded and meritless claim, keynoting similar assessments by my colleagues. After Christensen left the classroom for break, the other TAs stated that they agreed with her. My questions were allegedly "too deep" and unfair to students who, it was presumed, would be completely uncomfortable with the reading assignment. One classmate, following the narrative Christensen effectively started, told me that I should be cautious of coming across as only empathizing with "black, native American, and Latino students' experiences.

During class Christensen emailed me her reflective comments on my demo, thanking me for my passion and noting how impressed she was with my patience with the responses from other TA's. After class, I expressed to her that I felt that she hadn't allowed me to fully engage and teach as she did with the other TAs, and that I was avoiding her own "deficit thinking." She interrupted me and said that she never knew that she had her own deficit thinking and that it was uncomfortable for her to challenge it and she could imagine how my students would feel about this subject. (I have attached her comments) She didn't want me to introduce the material to students on the grounds that she herself was uncomfortable with it.

My third incident with Christensen was when a TA asked her about the policy for our dress code. She stated that she would rather have us present ourselves like a stereotypical teacher. When I met with her later that day to discuss some questions I had with the syllabus, she brought up the importance of how "we" carry ourselves. She stated that she would recommend that I do not wear tight or form-fitting clothing because I was young and attractive. She theorized

**Exhibit D**
**Page 2 of 6**

that an 18-year-old male first year student would spend more time looking at me then learning the material. She stated that she was aware that "black" women historically have been sexualized and that that would not be an issue if I made sure to follow the traditional dress code. She said she felt the need to tell me to make sure that I was not "personable" with my students, and did not get to know them outside of class. She said she didn't feel the need to express this to any of the other TA's but just to me because she "didn't want an issue like that to come across her desk." Overall, she said I uniquely needed to be mindful of how I carry myself around students. I felt ostracized, disrespected, and offended by her assumptions that I would have some lack of boundaries with students due to my culture.

The fourth incident with Christensen was when she and I met after my first class, Monday August 23rd, to work one on one on my weekly lesson plans. She stated that she felt the need to "micromanage" me until I understood how she wanted me to guide my students. She asked me how my first class went. I shared how a Latino student after class told me that I was the person that ever told him he, his lived experiences, and his perspective, based off of his subjectivity, were valid and would be respected in my class. I told her that it meant the world to me to be able to establish such a safe, and nurturing classroom environment. She said, "Well, I never had a student of color say that to me and if I were you, I wouldn't let it go to my head, let us see how he feels about you after you grade his first writing assignment." I told her that I simply appreciated making someone feel validated.

She asked me about my lesson plans. I told her that while I am introducing the "Normativity" lesson I wanted to break the students into small groups to respond to the articles' quotes about norms, and visit the Black Studies Department, Native American Studies, and OLLAS/Latino and Chicano Studies. She told me she liked and appreciated where my heart was but that the latter would potentially make my "white" students or individuals in those departments uncomfortable. I told her that I had spoken with individuals from each of these units and that they were willing, ready, and excited to have first year students visit. She then overtly states that she doesn't want me to teach it that way, even if it's within my pedagogy because she believes that my "white" students or students that identify as "white" would feel uncomfortable and probably do not have any experiences with individuals from multicultural communities. She told me she wanted me to teach the "Normativity" lesson in the exact way a "white" female TA in our workshop seminar presented it. She believed that that was both "safer" to do and easier.

My fifth incident with Christensen was when she asked all of the TA's their opinions on the first unit articles and whether we were optimistic or had a critique of them and why. I expressed to her and the class that I was frustrated with the articles because of the lack of diversity and perspective. I stated that people of color for centuries had been speaking on these same topics in the academic setting but because of their marginalization within the educational system, we have to hear their perspectives by taking electives, a condition I felt was a consequence of Eurocentrism and white supremacy ideology.  I then stated how I felt the educational system and society were built from the perspective of individuals who identified with the system and who were most often validated for their ideas and given credit, over the narratives of the oppressed for recognizing their privilege. Christensen then told me in front of the class that that

**Exhibit D**
**Page 3 of 6**

was not true and that she personally felt that all perspectives were welcomed in academia and at UNO. Students, as before, followed her line of critique, telling me that it's important to have a "white" perspective if that's going to get "white" people to listen. I told them that that idea was a problem and that that ideology was a projection of white supremacy. I gave the example of how I did Peggy McIntosh' article as a demo and there wasn't any article by a person of color in Unit One. Christensen interrupted me by saying that I needed to correct my own deficits before I began critiquing a system put in place for a reason.

As a result of these overt and covert microaggressions and adverse experiences, I began to have depression, panic, and anxiety attacks causing me to have to make a request to attend class on Zoom rather than in-person on August 24th.  A week prior to this class, Christensen assigned a reading and writing assignment, telling us to come to class prepared to discuss our perspectives. I asked my fiancé to listen in. Christensen asked all the TA's their perspectives on the article and then was preparing to dismiss the class for break without me having had an opportunity to comment. I told her that I wanted to share my thoughts and that I had a universal question for the class. She turned the camera around to listen to me.  I told her that I empathize with the professor in the article that critiqued Eurocentric standards of "proper writing" and who noted how it was imperative to develop cultural awareness of how students of color speak and write, and their reading styles. She then asked me. "Okay, so what's your question?" I had asked the people left in the classroom if we should call it English Language Writing if we want to be inclusive to all individuals. She stopped me and said. "Denisha, what you are saying is not profound, it's nothing short of what other people of color in English departments have critiqued! Do you think you're giving us the holy "black" perspective? Because, really you're not!"

The negative experiences I had in the department and its toxic environment are not unknown to other associates and affiliates in the program and in the English department writ large. A second year TA told me that having me in the English department was "really good for DEI" because I have been the only person of color he has seen since he has been there. He stated that he has a wife of color and that he is an ally to her struggle(s). I discussed with him some of the challenges and frustrations I had within the department. I reiterated the class situations and discussions with Christensen. He told me that he was an ally to me and that he was **not surprised**. The advice he gave me in order to **"survive"** in the department as a woman of color was to remember that **I simply will never have the same agency and autonomy that he has as a "white" person at the university** because of the unconscious prejudices the faculty, staff, and white students at the university will have. He agreed with Christensen that "white" students would complain and feel "outed" by me because I am a woman of color. He said **he knew it wasn't fair** but to protect myself, I needed to **make sure I tread lightly**. He followed it up by stating that if I need an ally or someone to vent to, that  he would be there for me and that he hoped that he hadn't contributed to any of my challenges.

An Instructor in the English Department and I were conversing before she began her presentation in the Writing Center for first year TA's. I knew this instructor throughout my undergraduate college career and was comfortable sharing with her the frustrations I had with Christensen. I expressed to her my challenges and frustrations. She stated that her biggest fear

**Exhibit D**
**Page 4 of 6**

was that **the English department would tokenize me as the "black" student** and not appreciate me. She told me that she **understands and is fully aware that I am being truthful** with all of my experiences **because of what she's seen professionally from the department**. She told me that she was an ally to me, and that she is **not surprised by how I am being treated** because **that's just how UNO treats people of color**. She encouraged me to stay to be a martyr to help change the system. She told me that Christensen was treating me that way because **she wanted to break me down and intimidate me.** .

Another instructor in the English department, and I were meeting because we agreed she would be my mentor for the program. She asked how things were going, and I shared everything with her. **She stated that she was not surprised by any of the experiences because the University was horrible and hypocritical to the true needs of students of color** because **they have not properly trained white students and faculty to be culturally tolerant and open** to people like me. She stated **she felt that my experiences were valid, and true.** I began to cry, telling her I wanted to leave the department and share my experiences with my fiancé who is a full faculty member. She told me that that wouldn't be wise because **the English department can sometimes be petty and hold grudges with people that speak out.** She encouraged me to stay, suggesting that I remain silent and complicit, and told me that I needed to understand that being at UNO  was only temporary.  She stated that if I were to tell my fiancé, things could get **"sticky" and "problematic"** because **these white racists in the department are the ones who are grading me.** She told me that she was an ally to me and that if I needed anything from her in regards to a letter of support to let her know. **She expressed that my experiences were valid and not surprising** because she openly identifies with the LGBTQIA+ Community and how **she has made complaints about students disrespecting her but never received support from any faculty to stop the mistreatment.**

On Wednesday, August 25th, I walked into the Writing Center. The Two TA's who were sitting there and the student assistant began discussing the dynamics of our first week of class. I shared my decision would not renew my second year teaching assistantship for the English department and told them everything that had happened to me up to that point and how other Instructors in the department believed that they were allies to me because **they validated my experiences but did nothing to change my experiences as a person of color.** Matilde began to express that **she was also not surprised** and how **she personally knows people of color with the same complaints from different departments.** She then told me that Travis, director of the Writing Center, had clout in the English department and could talk to Christensen about how she was making me feel and that I should converse with him, or with Kathy, the assistant director of the Writing Center.

After conversing with the individuals in the Writing Center, I walked over to OLLAS, where I am an alumna to converse with Yuriko. She was in the office with three female students eating lunch.  I began to cry, sharing my experiences and telling her how I wanted to quit because I felt alone. I told her that I was told to not share my experiences with my fiancé, whom she was familiar with. She told me that she agreed because things would become worse for me. She stated that she would speak with Juan Casas, but that I **should find white allies to support**

**Exhibit D**
**Page 5 of 6**

**me who are willing to speak up on what I am going through**. We began to discuss if Juan Casas could truly help me because he too is a person of color in a position of authority and could, in his advocacy of me, be perceived as "defending the poor bullied black student." We all agreed that that was a possibility so it was deemed more important to meet with Dr. Ramon Guerra, a Latino man in the English department and have him as an ally.

On August 17th, an associate professor in the English department, requested connection to my Facebook page. I had never interacted with her prior. I noticed she was from the University, and so I added her. Immediately she attacked my perspective, as well as my fiancé's perspective on the ideology associated with a popular book concerning "white fragility," claiming that her successful use of the book's insights with a group of "white" students, coupled with her own opinion, was determinist in this respect. She even suggested, assumptively, that we had not read or understood the book. I have attached the relevant screenshots here. I deleted her immediately after. I believe she was comfortable doing so because the University as well as the English department has failed to adequately train their faculty and staff concerning cultural and social boundaries.

I decided to also step down from the Critical and Creative Thinking program because the core concentration I had planned is similarly led by the English faculty and staff members. I felt that continuing would involve an endless cycle of traumatic experiences.

 I would like to request a formal meeting with Chancellor Li, and Graduate Dean Dr. Juan Casas concerning these events and including my legal counsel.

As a rape victim I was conditioned from my childhood to abide by the imposed secrecy of those who were predatory and abusive towards me and towards those people who had knew about the abuse, could have done something, and did nothing. I have lost 10 pounds from stress and my psychiatrist increased my depression medication in part, because of her concerns about the experiences I was involuntarily engaging at the University. Mentally, it is difficult not to draw an analogy between the collective conduct of certain officials at the University to those individuals that assaulted me. It is not in my character any longer to remain silent. I am speaking out on behalf of myself and my adverse experience and all those similarly situated who either did not have the support or the courage to do so. Something needs to change and it needs to change now!

Denisha Seals B.A.

**Exhibit D**
**Page 6 of 6**

9-25-2021

My fiancée Miss Denisha Seals recently withdrew from the Advanced Graduate Writing Program and from the CCT graduate program. She is an alumna of the Buffet Program and graduated from UNO with an Interdisciplinary Studies degree. I could begin by talking about the unbelievable journey she went through to complete college. Her journey from a family with alcohol addiction, neglect, and child molestation to her young adult life under the intrigues and deceptions of a child predator. Her persistence to a college degree despite bad advising and her placement in inappropriate courses by a former dean and a faculty member. Her emergence with a degree amidst her diagnosis of PTSD. Her attempt to get her alma mater to help her financially to even have a chance to engage graduate education which fell on deaf ears, despite a lot of chatter for a long time. I could talk about her status today as an award-winning filmmaker, published author, entrepreneur, and educational consultant. But all of those struggles against the odds and against those who consistently failed to support her or actually acted to harm her or subvert her aspirations pale against the present moment.

My sincere hope was that her experience as a TA and as a graduate student would somehow be successful, and different than I expected even though I knew **being "black" at UNO is inherently a problematic condition.** I have worked for almost a decade at a university that has and has always had, during my tenure and likely before, **fundamental** personal and structural problems in the areas of race, gender, disabilities, and so many other areas of so-called "diversity" and has consistently papered over them with layers of diversity initiatives, jingoistic slogans and campaigns, diversity committees, powerless executive level positions, and enough rhetoric of "whitesplaining" to build a monument. The problems extend from administration to faculty to students, impacting all levels of operations and the system generally holds no one accountable. Its problems in this area are among the worst I have encountered in my almost 3 decades in academia because here intolerance and microaggressions that exist everywhere are rendered as a kind of "white paternalism" where those who most undermine you claim that they are actually helping you by engaging in these behaviors. Those who see through these smokescreens and call them out for what they are, are deemed "radical" and isolated. Often officials hired to deal with diversity and inclusion are specifically those least likely to take on these systems of power and prejudice and in any case, they usually lack the influence or the courage to do so. The structure moves to threaten and intimidate those who try to address or bring attention to the problems. I have experienced all of this myself **personally** and have watched others go through the gristmill as students, as faculty, and as administrators. Many leave, others file lawsuits, some stay but become mere shadows of their own potentialities, silenced and marginalized, assimilated to uselessness. Most disturbing of all, many know about the problems. It's stunning when you go through these experiences, and all the colleagues around you say, "I experienced the same thing" or "I am not surprised." And that is as far as it goes. Allyship here means at best, commiserating but not fighting with the person or people who experience the trauma or mistreatment against the system. And the purpose of that kind of allyship is merely to neutralize the threat to the status quo and to maintain the modus operandi.

Miss Seals has written a detailed letter concerning the particular experiences which necessitated her withdrawal. If the past is allowed to rule, this letter will be buried, the faculty and administrators who failed her not held to account, and some paper-thin explanations given to try to explain away the inappropriate actions and statements of systemic entities creating this situation. Alternatively, this could be an institutional opportunity for finally getting serious about these things.

# Exhibit E
# Page 1 of 3

There is no point discussing, spending money, or doing anything related to DEIA if the experiences of "diverse" administrators, staff, faculty, and students continues to be analogous to hers and to mine (By the way while my own experiences here are not properly the subject of the present moment, they are not substantially different.  I think that is telling). "Diversity" at UNO, while it may be part of a thousand mission statements, goals and objective lists, and workshops is meaningless if it only means changing the physical appearances of those coming through the doors. It means being challenged to review pedagogies, curricula, priorities in terms of distribution of resources and other things, not only to recruit, but also to retain, and to show, in the willingness to redistribute power, influence, and extend the capacity to newcomers to redefine UNO, that the university is serious about something more important than diversity and that is inclusion.

I should mention that I am chairman of the DEI Workgroup for GLOBE, an award-winning program of NASA, and work in developing DEI policy for that national STEM educational program. I say that to point out that when I say the institution has been doing this wrong to this point that I say it not merely because of my personal experience as one of the precious few and short-lived Africana male chairs here or my background in a discipline concerned with a people who suffer when diversity is not respected or as a relationship partner to someone who herself is a victim of this kind of trauma but as a practicing professional who is respected outside of this institution (unlike inside) as one who produces innovative ideas in this field. Diversity talk is useless without an inclusive walk.

The founding fathers said the hallmark of a democracy was an educated populace, willing to speak out to critique government and the state when it was wrong. Critique, grounded in truth, honesty, and a mutual interest in progressive change was, in their thinking, both fuel in the engine of positive social progress and also a protective barrier, designed to ensure that the excesses of modernity and mistakes of fallible man did not destroy their "experiment," making it default to tyranny and authoritarianism.

The university is built of disciplines which employ critique to enlist students and faculty and the society in solving the great questions of civilization and humanity. None of us would deign to work in an environment without academic freedom, in which we could not critique ideas and practices. But sadly, the university's relentless commitment to critique frequently ends at itself. It interrogates, but intentionally evades the important modern question of what "university" and often an associated Eurocentric ideology, philosophy, and methodology mean in the context of diversity and inclusion and defaults to a kind of structural-pathological immune system response to "neutralize the invaders."

In doing so, it impugns not only its capacity to serve the new world of the present but denies itself the creative talents and insights of that world. It engages itself in a slow march to obsolescence and irrelevance. Worst of all, it does not have to do so and negates itself in the act. After almost a decade of service I see UNO as being at a dangerous intellectual crossroads. All of the diversity rhetoric and posturing will not save this institution, as good as it sounds and as warm and fuzzy and inclusive as it makes us all feel. The institution must aggressively and definitively move towards inclusion, which inherently is a discussion about how power and responsibility are shared. The institution cannot seek vainly and errantly to remain as it has always been and should be excited about becoming more than it is. But this is a collective choice and a fateful one. I have often been disliked and professionally punished at UNO for speaking truth to power, unapologetically, whether it was personal, as in this case, or on behalf of others who suffered because of our institutional failures. But I have no regrets and intend to stay the course. This is what made me desire to be a scholar, an educator, an administrator, and a

**Exhibit E**
**Page 2 of 3**

worker on behalf of marginalized communities in the first place and represents what I think is the best of the kind of human being that can come out of a university at its most inclusive.

Dr. Nikitah Okembe-RA Imani

Professor, University of Nebraska at Omaha

Former Chair, Department of Black Studies (2012-2015)

**Exhibit E**
**Page 3 of 3**

Name: Denisha M Seals | DOB: 9/6/1990 | MRN: 00632579 | PCP: James M McCluskey, MD

# Letter Details

 **Nebraska** **Medicine**

**UNMCP General Psychiatry**
510 S. 42ND STREET
OMAHA NE 68198-5575

Phone 402-552-6007
Fax 402-552-6035

April 5, 2021

Denisha M. Seals

To Whom It May Concern:

Denisha M Seals was initially evaluated in our clinic in 2015 and continues to receive medical treatment here. Denisha's primary diagnoses include: PTSD and ADHD. She has also undergone neuropsychological testing. We would expect Denisha to require some accommodations in the school setting if she is to succeed, specifically:
- increased time to complete tests
- increased time to complete assignments
- a private area for test-taking

Please consider her diagnoses and their discrete ramifications as you develop an educational plan to suit her needs. We appreciate your ongoing efforts to provide Denisha an optimal educational experience.

Sincerely,

Lauren T Edwards, MD

3:38 PM, 4/5/2021

NEBRASKA MEDICINE
UNMCP GENERAL PSYCHIATRY
510 S. 42ND STREET
OMAHA NE 68198-5575
Dept: 402-552-6007
Dept Fax: 402-552-6035

**Exhibit F**
**Page 1 of 8**

*This letter was initially viewed by Denisha M Seals at 4/12/2021 7:47 AM.*



| UNO Office | UNMC Office |
|---|---|
| HK 104 | SLC 2031 |

402-554-2872 phone | 402-554-6015 fax
unoaccessibility@unomaha.edu

## SELF-IDENTIFICATION FORM

Please contact ASC if you need assistance in completing this form.

**DEMOGRAPHIC INFORMATION**

NU ID: 212-03-039               Today's Date: 6/22/21

Legal First Name: Denisha, Michele               Legal Last Name: Seah

Preferred Name: _____               Pronouns: _____

Student Email: dseals@unomaha.edu               Date of Birth: 9/6/90
(@unomaha.edu or @unmc.edu)               (They/Them, She/Her, He/Him, Xe/Xir, Other)

Primary Phone: 531-333-0582               Alternate Phone: 531-210-0853

Is it safe to leave you a voice mail at this number?               Is it safe to leave you a voice mail at this number?

☐ No  ☑ Yes               ☐ No  ☑ Yes

**INSTITUTION**

☑ UNO  Major/Program: Critical & Creative Thinking : Graduate Certificate Program

☐ UNMC  College/Program/Campus: _____

Transferring from another institution? ☑ No  ☐ Yes  Name: _____

Who referred you to ASC? Dr. John Price, Dr. Joe Price, & Dr. Nikitah Imani

**DISABILITY INFORMATION**

Check all that apply:

☑ Physical Disability, Psychological Disability, Sensory Disability, Learning Disability

☐ Temporary Disability - Until this date: _____

☐ Medical Supervision - Start Date: _____  End Date: _____

☐ Housing Accommodation Request

1. Please list and describe any disability impairment type(s) affecting you.

Psychological
Sensory
Learning

**Exhibit F**
**Page 2 of 8**

1

2. How does the disability impairment type interfere with your classes and activities?

*Test Anxiety, Stress, Over-stimulation, lack of concentration*

3. Please list any adjustments or accommodations you believe would provide equal access to your UNO/UNMC classes, programs, and activities.

*Video communication w/ professor longer time on assignments/papers/exams*

**OUTREACH**

The ASC offers support to students through periodic outreach, which might include event notifications, job postings, scholarship announcements, or wellness and self-care reminders. Receipt of this information is purely voluntary.

Is it OK if we send you occasional outreach emails? ☐ No  ☑ Yes

**NOTICE OF EMAIL COMMUNICATION**

In order to provide disability-related accommodations, your UNO instructors or your UNMC program directors will receive an official notification email from the Accessibility Services Center. The notification will indicate your name, NU ID, and your accommodation plan. The notification email will not disclose any information about your disability or impairment.

I certify that the information I have provided is true and correct to the best of my knowledge.

Signature: _____  Date: 6/22/21

**Exhibit F**
**Page 3 of 8**

2



| | |
|---|---|
| **UNO Office** | **UNMC Office** |
| **HK 104** | **SLC 2031** |

402-554-2872 phone  |  402-554-6015 fax
unoaccessibility@unomaha.edu

## CONSENT FOR USE OF ALTERNATE SERVICE MODALITIES

Please contact ASC if you need assistance in completing this form.

First Name: _Denisha_          Last Name: _Seah_

NU ID: _212·93·039_          Today's Date: _6/22/21_

Institution: ☑ UNO   ☐ UNMC

Accessibility Services Center ("ASC") has adopted a variety of service modalities, such as telephone calls or zoom video conferencing, that may be utilized in lieu of some face-to-face meetings. ASC may not be able to ensure confidentiality in communication through these platforms, which are limited in technological security.

Please select **one** option below:

☑ **I consent to alternate service modalities, such as telephone calls or zoom video conferencing. I understand that confidentiality cannot be ensured at the same level as face-to-face meetings. I understand that I may revoke this consent at any time.**

☐ **I am not interested in using alternate service modalities. I only want to meet with ASC personnel on a face-to-face basis. I understand that services may occasionally be limited or unavailable to me in a timely manner. I understand that I can change my mind at any time and sign a new consent form.**

My signature below indicates that I have read, understood, and will abide by all the terms and conditions of this agreement.

Signature: _[signature]_          Date: _6/22/21_

**Exhibit F**
**Page 4 of 8**



| UNO Office HK 104 | UNMC Office SLC 2031 |
|---|---|
| 402-554-2872 phone  |  402-554-6015 fax unoaccessibility@unomaha.edu | |

# UNO ACCOMMODATION PROCEDURES

Please contact ASC if you need assistance in completing this form.

**INSTRUCTOR NOTIFICATIONS**

In order to provide disability-related accommodations, your UNO instructors will receive an official notification email from the Accessibility Services Center. The notification will indicate your name, NU ID, and your accommodation plan. The notification email will not disclose any information about your disability or impairment.

**STUDENT RESPONSIBILITIES**

Please acknowledge your understanding of these student responsibilities by initialing after each section.

### Notification Emails

- Confirm with each instructor that they received the notification email.
- Contact ASC if you have not received your notification email ten days prior to classes beginning.
- Supply ASC with the names of instructors not listed on the class schedule.
- Inform ASC if you drop or add classes after the notification email was sent.

Student Initials: **DS**

### Using Accommodations

- Meet and/or correspond with each instructor every semester to develop a plan for implementing your accommodations.
- Communicate with instructors throughout the semester, and make requests for accommodations in a timely manner.
- Keep all emails related to accommodations from ASC and from instructors.
- After face-to-face conversations, follow up with an email summary for documentation purposes.

Student Initials: **DS**

### Accommodation Support

- Contact ASC to review accommodations, student responsibilities, and/or matters related to faculty communication.
- Contact ASC with concerns about accommodations, denial of accommodations, or other related concerns.

Student Initials: **DS**

My signature below indicates that I have read, understood, and will abide by all the terms and conditions of this policy and procedure document.

Signature: _____     Date: 6/22/21

**Exhibit F**
**Page 5 of 8**



| UNO Office | UNMC Office |
|---|---|
| HK 104 | SLC 2031 |

402-554-2872 phone  |  402-554-6015 fax
unoaccessibility@unomaha.edu

## UNO ACCOMMODATED TESTING PROCEDURES

Please contact ASC if you need assistance in completing this form.

The UNO Testing Center ("TC") is available to students who have testing accommodations as part of their accommodation plan developed through the Accessibility Services Center ("ASC.") Please observe the following policies and procedures for utilizing the TC for accommodated testing:

**STUDENT RESPONSIBILITIES**

Please acknowledge your understanding of these student responsibilities by initialing after each section.

### Meet With Your Professors

- Verify that each instructor received your accommodation plan from ASC.
- Review each syllabus to find exam dates and testing formats.
- Discuss your testing accommodations with each instructor, and explain any alternate format conversions that will be required.
- Alternate format conversions should be requested as far in advance as possible to avoid delays in material availability.
- If you or your instructor have questions about alternate format arrangements or need assistance converting exam content, please contact ASC.

Student Initials: DS

### Schedule Your Exams

- To schedule exams, call the TC at 402-554-4800, email the TC at unotestingcenter@unomaha.edu, or visit the TC in person during office hours at Kayser Hall, Room 522.
- You must schedule exams with the TC at least *five business days* in advance of the examination date.
- Exams should be scheduled as close as possible to the same date and time as the classroom exam date. Any flexibility must be discussed with and approved by your instructor prior to the exam date.
- It is strongly recommended that you schedule the *entire semester's exams* in advance after discussing accommodations with your instructors.
- If you have Extended Time as an accommodation, you must schedule for the full extended time, even if you think you will not use it.
- Testing accommodations must be part of your existing accommodation plan. If you want to modify your plan, please contact ASC.

Student Initials: DS

### Confirm Your Appointments

- Call the TC at 402-554-4800 at least 24 hours in advance to confirm your exam accommodations.
- Ask the TC if the testing materials have been delivered to them.
- Verify the precise start time for your exam.

Student Initials: DS

**Exhibit F
Page 6 of 8**

1

**Attend Your Exam Appointments**
- Arrive on time. If you arrive more than 15 minutes late, you will be marked as a "no show," and you will need instructor approval to reschedule your exam.
- Bring valid photo identification. A UNO MavCard is preferred.
- Store your personal items in a TC locker during your exam. Electronic devices are not allowed in the TC unless specifically permitted by your accommodation plan.
- Food and drink are not allowed in the TC unless specifically permitted by your accommodation plan.
- Exam sessions are electronically monitored and may be videotaped.
- All students must abide by the University's policy on Academic Integrity. The TC is required to report any acts of academic dishonesty.

Student Initials: _DS_____

My signature below indicates that I have read, understood, and will abide by all the terms and conditions of this policy and procedure document.

Signature: _____    Date: _6/22/21___

**Exhibit F**
**Page 7 of 8**

2



## ACCESSIBILITY SERVICES CENTER

| UNO Office | UNMC Office |
|---|---|
| HK 104 | SLC 2031 |

402-554-2872 phone  |  402-554-6015 fax
unoaccessibility@unomaha.edu

## ASSISTIVE NOTE-TAKING DEVICES AGREEMENT

Please contact ASC if you need assistance in completing this form.

First Name: Denisha          Last Name: Sean

NU ID: 212-93-039          Today's Date: 10/22/21

Institution: ☑ UNO   ☐ UNMC

| TERMS OF AGREEMENT | INITIAL EACH SECTION IF YOU AGREE |
|---|---|
| I will use materials only for my own personal academic use during this specific course. | |
| I understand that faculty members have copyright interest in their course materials, and I agree not to infringe on this right in any way. | DS |
| I will not release, digitally upload, or otherwise share all or part of the course materials. Additionally, I agree that I will not profit financially and will not allow others to benefit personally or financially from the course materials. | DS |
| I understand that any violation of this agreement may subject me to discipline under the Student Code of Conduct and subject me to liability under copyright laws. | DS |
| I understand that ASC will notify my instructors of this agreement. | DS |
| I understand that I only have the right to use the electronic files for the academic term of the course. | DS |

Exchange of any materials or electronic files, in a modified format or copy thereof, is a violation of the US Copyright Act. Separate authorization must be obtained for every use of these materials or electronic files, its modified format, or copy thereof.

My signature below indicates that I have read, understood, and will abide by all the terms and conditions of this agreement, with no exceptions.

Signature: _____          Date: 10/22/21

**Exhibit F**
**Page 8 of 8**

8-10-2021

I'm writing this letter to reiterate concerns I have raised on many occasions here at UNO. Those concerns revolve around the way we as an institution grapple with our legal and professional responsibilities as it relates to students with documented disabilities. These matters are of very high personal concern to me. First, I have a neurodiversity issue myself, dyslexia, which led to me being reassigned into special education classes at school. Ultimately, a "gifted" teacher heard me reading and I was "rescued." But the lack of understanding and response of the public education system to my own condition meant that I came within an inch of potentially not finishing my education at all. I am a sociologist and political scientist by training and so I have spent a lifetime researching and studying discriminatory treatment experienced by many in society including those with special needs. This scholarly work has led to activism and ministry on behalf of veterans who came back from modern wars with a higher level of physical and mental trauma and victims of domestic abuse. Recently, we have found that sexual and childhood trauma and physical abuse create the same types of problems for those who are victimized. UNO promotes its support for veterans' education and reaches out to students from multicultural communities and the poor who are more likely to have experienced some of these challenges and often with little familial and infrastructure support. That means we must have a concomitant commitment to what we do on the service end to support this constituency. I have a fiancée, currently enrolled in graduate school, who also requires accommodations. Finally, I serve as chair of the NASA GLOBE Working Group for DEI which monitors DEI related compliance for NASA GLOBE, where we deal daily with issues of neurodiversity and differential physical abilities as well as more "traditional" categories of difference.

I am glad for all the changes I see in the accessibility office that appear to show we have ratcheted up our seriousness and commitment to these issues. However, I had one unnerving experience that I want to flag up. When my fiancée was having her orientation with that office, she was told something I find extremely problematic. Note that I was present when this conversation took place. Essentially, she was told that it was up to the discretion of the instructor as to whether they would abide by the accommodation. My first degree was in the law and I was on the board of the ACLU for a time and having been through several suits related to this, I am relatively clear that neither the ADA nor Section 504, the governing federal provisions here are optional. Once a student has notified the university according to the official process, been issued an accommodation, and made the instructor aware of it, the institution and the instructor must work jointly with the student where needed to institute the reasonable measures.

I met with Dr. Shipp concerning some deficiencies we had in the past in this regard. One being later notification to the instructors which made it difficult to put the appropriate accommodations in place prior to the beginning of a semester, creating a risk that a student with disadvantages already would be further behind. I also noted that often the office, then under a different name, would send out the letter and then leave the instructor to deal independently with the accommodations, even if the instructor did not know how to implement them or did not have the resources. At most universities, the dialogue concerning the student does not end at the letter but also continues with the facilitation of the accommodations and even to the monitoring of their effectiveness and progress through the semester. At the end of the meeting, I was made to understand that our work here was admittedly falling short in some respects and that we were moving to get better. I am very happy to see we have in some respects.

But what my fiancée was told, beyond being incorrect, could be devastating to whatever other efforts we make. If you tell a student all of this is discretionary and the faculty are allowed to believe it is, they can

**Exhibit G**
**Page 1 of 2**

just treat the entire matter as inconvenient, and we are left with their personal goodwill instead of the law as the governing element. We cannot allow that to happen. My fiancée as but one example, was very concerned because she had a prior experience at UNO, in the graduate school, where an instructor essentially said he did not have time and did not want to deal with one of her accommodations. She did not apprise me of that at the time, so I did not get an opportunity to address it. But I have told her, this time up front, that I do NOT view the ADA or the 504 as optional based on the discretion of an instructor and I do not advise my students to do so either. I also tell colleagues that they must endeavor wherever possible. to comply and seek assistance from the office if they have problems. I have done so when I had challenges in the past.

It does seem appropriate to say that Academic Affairs would have to be involved if an instructor chose not to comply, but saying it's simply up to them is in my estimation, problematic altogether.

I think we need re-educate faculty and deans and others about this, rather than saying stuff in the opposite direction. It will save the university and the state from facing a major liability problem if things go wrong. I just read about a situation where a tenured 41-year professor in a class refused to give a student his accommodations in terms of notes, arguing that it was an unfair advantage. He even sent that communication out to all students. He described the communication telling him he should comply, coming from the accessibility office, as "coercive." Summary. He resigned from the university, I think, because he knew what was coming. The university apologized to the student and is left kind of hoping that there is not a lawsuit, which the student is still entitled to, based on the conduct.

Nikitah Okembe-RA Imani, Ph. D

**Exhibit G**
**Page 2 of 2**



*State of Nebraska*

**EQUAL OPPORTUNITY COMMISSION**

| | |
|---|---|
| Denisha M. Seals , | ) |
|     Complainant, | ) **COMMISSION DETERMINATION** |
| | ) |
| vs. | ) NEB 1-21/22-11-52317-RS |
| | ) EEOC 32E-2022-00049 |
| University of Nebraska - Omaha, | ) |
|     Respondent. | ) |
| | ) |

A determination has been made in the above-referenced matter before the Nebraska Equal Opportunity Commission. Pursuant to the **Nebraska Fair Employment Practice Act** and the Rules and Regulations of the Nebraska Equal Opportunity Commission, the Commission has officially dismissed this charge.

The evidence fails to support the allegations of discrimination (see attached); and there is no appeal process. This finding of **no reasonable cause** is the final determination of the Commission and completes the handling of the charge. The deadline for filing an action directly in state district court is 90 days after the receipt of this notice.

Because this charge was also filed under Federal law, you may contact the U.S. Equal Employment Opportunity Commission in St. Louis within fifteen (15) days of your receipt of this notice regarding this case. Requests for a Substantial Weight Review can be made to Joseph Wilson via email at Joseph.Wilson@EEOC.gov, or if you do not have access to email, you may request it in writing to Joseph Wilson, State and Local Coordinator, U.S. Equal Employment Opportunity Commission, St. Louis District Office, 1222 Spruce Street, Room 8.100, St. Louis, MO 63103.

Due to the complexity of the law, and other avenues of redress that may exist, you may wish to consult with an attorney.

The Commission wishes to thank you for your cooperation in the processing of this charge.

_____
For the Commission

AUG 1 8 2022
_____
Date

**MAIN OFFICE:**
1526 K St, Suite 310
Lincoln, NE 68508-2734
Phone: 402-471-2024
Fax: 402-471-4059
800-642-6112

**BRANCH OFFICES:**
1313 Farnam St. Suite 318
Omaha, NE 68102-1836
Phone: 402-595-2028
800-382-7820

505A Broadway Suite 600
Scottsbluff, NE 69361-3515
Phone: 308-632-1340
800-830-8633

**ONLINE:**
Website:
NEOC.nebraska.gov

Facebook:
https://fb.me/NebEOC