IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DENISHA M. SEALS,

                        Plaintiff,

        vs.

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA, and
MARGARETTE CHRISTENSEN, PhD,

                        Defendants.

**8:22CV420**


**MEMORANDUM AND ORDER
REGARDING DEFENDANTS' MOTION
TO STRIKE AND DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Denisha M. Seals, an African-American woman, alleges that she was subjected to race discrimination and harassment in employment and a racially hostile educational environment during the short time she was a teaching assistant in the English Department at the University of Nebraska Omaha (UNO). Defendants in this action, the Board of Regents of the University of Nebraska (Board of Regents) and Seals's program supervisor, Dr. Margarette Christensen, have filed a Motion for Summary Judgment on all Seals's claims. Filing 95. They have also filed a Motion to Strike, Filing 109, as to various parts of Seals's Index of Evidence in Opposition to Defendants' Motion for Summary Judgment. The Motion to Strike is granted in part and denied in part, and the Motion for Summary Judgment is granted as to all claims.

The Court begins with an introduction outlining its ruling in this matter. Because the Motion to Strike is determinative of whether the Court can consider certain parts of the record on the Motion for Summary Judgment, the Court will follow the introduction with consideration of the Motion to Strike.

## I.   INTRODUCTION

Seals's lawsuit against the Board of Regents and Dr. Christensen arises from Seals's eighteen (18) days of service as a teaching assistant for an introductory English class at UNO.

1

Seals claims that during the very short time that she trained for and served in this capacity, she was subjected to race discrimination, harassment in employment, and a racially hostile educational environment. Defendant Dr. Christiansen, and others who are the subject of Seals's allegations, vehemently deny making the statements and engaging in the conduct Seals alleges is actionable. Defendants go on to point out in factual statements that Seals does not dispute that Seals previously made very similar allegations against another former employer and against a medical provider. Filing 105 at 26–27 (¶¶ 139–143). One medical provider observed that Seals "misrepresents situations when she gets more stressed out." Filing 96-4 at 249.

Although this Court acknowledges the dispute regarding the veracity of the factual allegations in this case, the role of the Court on Defendants' Motion for Summary Judgment is not to weigh competing evidence or to try to discern the truth of any factual issue. Instead, the Court should grant summary judgment in this case only when the evidence, viewed in a light most favorable to Seals, shows the Defendants are entitled to judgment as a matter of law. Therefore, the Court has assumed for the sake of argument that the statements involved were made and that the conduct involved took place as Seals alleges. However, even with that assumption, the Court concludes that the statements and the conduct alleged are not sufficient under the law to reach a jury. The Court therefore grants summary judgment in favor of the Defendants on all claims.

## II.  DEFENDANTS' MOTION TO STRIKE

### A.  The Challenged Materials

The Court begins with its analysis and ruling on Defendant's Motion to Strike. Filing 109. Seals's Index of Evidence in Opposition to Defendants' Motion for Summary Judgment, Filing 104, consists of three declarations. The first declaration is by Seals. Filing 104-1. Exhibit A to Seals's Declaration is a photograph of the cover of a book by Donald L. Finkel

entitled TEACHING WITH YOUR MOUTH SHUT and a photograph of the flyleaf and title page of the book with the name Maggie Christensen printed in ink or pencil on the flyleaf. Filing 104-1 at 25–27. Seals avers in her Declaration that Exhibit A is "a true and correct picture of the book 'Teaching With Your Mouth Shut' given to me by Dr. Christsen [sic] with her name signed." Filing 104-1 at 23 (¶ 205). The second declaration is by Dr. Nikitah Okembe-RA Imani. Filing 104-2. Imani identifies himself as "a Full Professor in the Black Studies Department of the University of Nebraska – Omaha ('UNO')." Filing 104-2 at 1 (¶ 5). He adds, "Mrs. Seals and I were married in October of 2024 . . . although at the time in question we were not yet married." Filing 104-2 at 1 (¶ 7). The third declaration is by John Cartier. Filing 104-3. Cartier identifies himself as "counsel of record for Plaintiff in the above-referenced matter." Filing 104-3 at 1 (¶ 3). Cartier identifies Exhibit D to his Declaration, Filing 104-3 at 4–14, as "a true and correct copy of excerpts from Plaintiff's medical records from her provider, Dr. Edwards[,] that was produced to Defendants' counsel." Filing 104-3 at 2 (¶ 9).

In their Motion to Strike, Defendants ask the Court for an order striking the following from Seals's Index:

1.     Exhibit A to the Declaration of Plaintiff Denisha M. Seals *[Filing 104-1]*;

2.     Paragraphs 10-13, 25, 27, 32, 53-54, 57-64, 68-69, 71, 74-75, 78, 80, 84, and 92-95 of the Declaration of Dr. Nikitah Okembe-RA Imani *[Filing 104-2]*; and

3.     Paragraphs 6-8 of the Declaration of John Cartier along with Exhibit D attached thereto *[Filing 104-3]*.

Filing 109 at 1 (italics in the original). The Court will consider the challenged items or categories of materials in turn.

3

**B. Seals's Exhibit A**

Somewhat strangely, in the Court's view, the most hotly contested part of Defendants'
Motion to Strike is the request to strike Exhibit A to Seals's Declaration—the photographs of the
cover and pages of TEACHING WITH YOUR MOUTH SHUT. Filing 104-1 at 25–27. Indeed, it is the
only part of the Motion to which Seals mounts a detailed opposition.

*1. The Parties' Arguments*

Defendants argue that Seals failed to produce a copy of Exhibit A to Defendants during
discovery, so Exhibit A should be stricken. Filing 111 at 3. More specifically, Defendants argue
that Seals makes no effort to explain her failure to make a timely disclosure of Exhibit A
pursuant to Federal Rule of Civil Procedure 26(a). Filing 111 at 5. Defendants assert that Seals
cannot have any justification for the late disclosure because she claims to have been in
possession of Exhibit A since August 2021. Filing 111 at 5 (citing Filing 104-1 at 23 (¶ 205)).
Defendants argue that they have been prejudiced by the untimely disclosure because they were
deprived of the opportunity to cross-examine Seals regarding the contents of Exhibit A prior to
Seals offering it in opposition to Defendants' Motion for Summary Judgment. Filing 111 at 6.
Defendants assert that allowing Seals to be deposed regarding Exhibit A now would only delay
the disposition of their Motion for Summary Judgment. Filing 111 at 6. Defendants also assert
that exclusion of Exhibit A is not tantamount to dismissal of Seals's claims but simply an
appropriate sanction for her failure to comply with discovery rules. Filing 111 at 6.

Seals argues that a party is allowed to use information that was not properly disclosed
under Rule 26(a) if the failure was substantially justified or harmless. Filing 114 at 3. She
explains, "In this instance, Plaintiff did not recall that she got this book from Dr. Christensen
until she remembered it during the course of preparing for the response to Defendants' Motion
for Summary Judgment." Filing 114 at 4. Seals asserts that Defendants have not demonstrated

any prejudice from late disclosure of Exhibit A other than not having the chance to ask Seals about it during depositions. Filing 114 at 4. However, Seals argues there is no prejudice to Defendants because the book came from Christensen who knew about it during discovery, Christensen did not disclose it herself, and Defendants decided not to ask about it during Seals's deposition. Filing 114 at 4. Thus, Seals argues that Defendants had ample opportunity to depose her and Christensen about the contents of Exhibit A if they had wanted to do so. Filing 114 at 4.

In reply, Defendants point out that Seals offers no supporting evidence for her failure to recall getting the book from Christensen. Filing 118 at 4. Defendants reiterate that they have been prejudiced by the failure to disclose Exhibit A because "[t]he issue is not whether Dr. Christensen knew about the book, but rather whether Plaintiff timely disclosed that she intended to rely on *Exhibit A* as evidence in this case." Filing 118 at 5 (italics in the original). They then point out that they were deprived of the opportunity to examine Seals about the contents of the book and the circumstances surrounding her receipt of it. Filing 118 at 5. Defendants assert that the purpose of the federal discovery rules is to prevent such surprises. Filing 118 at 5. Defendants also reiterate that the proper sanction is exclusion. Filing 118 at 5.

### 2. *The Belated Disclosure under Rule 26 Does Not Warrant Sanctions under Rule 37*

Federal Rule of Civil Procedure 26 requires compliance with discovery requests and supplementation of responses when new evidence is discovered. Fed. R. Civ. P. 26. "The disclosure mandates in Rule 26 are given teeth by the threat of sanctions in [Federal Rule of Civil Procedure] 37." *See Petrone v. Werner Enters., Inc.*, 940 F.3d 425, 434 (8th Cir. 2019) (*Petrone I*) (quoting *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018)). Specifically, Rule 37(c)(1) provides, "If a party fails to provide information . . . as required by Rule 26(a)," then "the party is not allowed to use that information . . . to supply

evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Thus, Rule 37(c)(1) is not applicable until the undisclosed evidence is used in a listed proceeding. *See Petrone I*, 940 F.3d at 435; *accord Petrone v. Werner Enters., Inc.*, 42 F.4th 962, 968 (8th Cir. 2022) (*Petrone II*) (emphasizing this point, citing *Petrone I*, 940 F.3d at 435).

Here, Exhibit A was undeniably untimely disclosed when it was not produced prior to Seals's attempt to use it in opposition to summary judgment. Fed. R. Civ. P. 26(a). Rule 37(c)(1) is applicable here because Seals has used Exhibit A "on a motion," that is, in opposition to Defendants' Motion for Summary Judgment. *Id.* The only real question is whether the Court should impose any sanction for the belated disclosure of Exhibit A.

The district court has discretion to consider lesser sanctions than exclusion of the evidence under Rule 37, but "the district court's discretion to fashion a remedy or sanction for discovery violations under Rule 37 is not absolute." *Vanderberg*, 906 F.3d at 704 (quoting *Doe v. Young*, 664 F.3d 727, 734 (8th Cir. 2011)). Rather, the discretion "narrows as the severity of the sanction or remedy it elects increases." *Id.* (quoting *Young*, 664 F.3d at 734). Specifically, "[w]here the exclusion of evidence is tantamount to dismissal, a district court may need to first consider the possibility of lesser sanctions." *Id.* at 704–05. The party facing Rule 37(c)(1) sanctions has the burden to show its misconduct deserves only a lesser sanction, but "[t]he district court d[oes] not abuse its discretion by not imposing a lesser sanction when [that party] never request[s] one." *Id.* at 705.

More specifically, the Eighth Circuit Court of Appeals has explained,

"A district court 'has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case' when a party fails to provide information ... in compliance with Rule 26(a)." *Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 644–45 (8th Cir. 2022) (quoting *Wegener v. Johnson*, 527

F.3d 687, 692 (8th Cir. 2008)). In fashioning a remedy, courts should consider "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Id.* at 645 (quoting *Wegener*, 527 F.3d at 692).

*Zick v. Paccar, In*c., 47 F.4th 672, 677 (8th Cir. 2022). Bad faith is not required to bar untimely disclosed evidence if there is no justification. *Vanderberg*, 906 F.3d at 704.

Here, the Court does not believe that Seals concealed Exhibit A in bad faith, but the Court finds the excuse of a faulty memory is little or no justification. *See id.* (explaining that bad faith is not required to impose a sanction for nondisclosure); *see also Zick*, 47 F.4th at 677 (identifying the reason for nondisclosure as the first factor in determining the proper sanction). Seals has had more than two years since filing suit to recall events related to her claims—many of which she claims to recall in vivid detail. The excuse also rings hollow when Seals mentioned in her Deposition on October 11, 2024, that Christensen gave her the book, but that is months earlier than Seals claimed in her Opposition to have remembered that Christensen had given her the book. *Compare* Filing 96-4 at 63 (Seals Depo. 164:18–22), *with* Filing 114 at 4 (explaining the belated disclosure because Seals did not remember receiving the book until preparing her opposition to summary judgment).

On the other hand, the Court finds that Defendants' assertion of "surprise and prejudice," *Zick*, 47 F.4th at 677 (another factor), is unavailing. *See also Wallace v. Pharma Medica Rsch., Inc*., 78 F.4th 402, 409 (8th Cir. 2023) (explaining that even if a disclosure is inadequate, the complaining party must articulate how it was (or will be) prejudiced by the late disclosure). Defendants—like Seals—had notice that Christensen gave Seals a book called TEACHING WITH YOUR MOUTH SHUT from Seals's Deposition, but Defendants did not take the opportunity to question Seals about the content of the book or the circumstances under which Christensen gave it to her. Under these circumstances, the Court concludes that Seals's failure to disclose Exhibit

A was harmless. Fed. R. Civ. P. 37(c)(1) ("[T]he party is not allowed to use [undisclosed] information . . . to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless."). Indeed, the Court concludes that this issue has consumed more of the parties' and the Court's time and resources than it warranted.

The part of Defendants' Motion to Strike seeking exclusion of Exhibit A is denied.

### C. The Challenged Paragraphs of Imani's Declaration

Next, Defendants argue that paragraphs 10–13, 25, 27, 32, 53–54, 57–64, 68–69, 71, 74–75, 78, 80, 84, and 92–95 of Imani's Declaration should be stricken. Filing 111 at 7. The Court concludes that this part of Defendants' Motion to Strike stands on much firmer ground.

*1.    The Parties' Arguments*

Defendants argue that the challenged paragraphs of Imani's Declaration should be stricken because Imani lacks personal knowledge regarding the matters stated in those paragraphs. Filing 111 at 7. Defendants argue that Federal Rule of Civil Procedure 56(c)(4) requires that an affidavit or a declaration must be made on personal knowledge and Federal Rule of Evidence 602 requires a witness to have personal knowledge of the matter asserted. Filing 111 at 7. However, Defendants argue that "[e]ven a cursory review" of Imani's declaration illustrates that he does not possess sufficient personal knowledge regarding allegations he makes in paragraphs 10–13, 25, 27, 32, and 84 pertaining to Seals's purported diagnosis as "neurodivergent," the effect of such a diagnosis on her ability to recall events, and her purported post-traumatic stress disorder (PTSD) diagnosis. Filing 111 at 7. Furthermore, Defendants assert that Imani improperly presents testimony in paragraphs 53–54, 57–64, 68–69, 71, 74–75, 78, 80, and 92–95 regarding conversations Seals had with various individuals although he was not present during those conversations. Filing 111 at 7. Thus, Defendants assert that these paragraphs should be stricken and disregarded for purposes of summary judgment. Filing 111 at 8.

Seals's entire response to this part of Defendants' Motion to Strike is the following:

> Defendants argue that these paragraphs should be stricken due to Dr. Imani[']s lack of personal knowledge. However, Federal Rule of Evidence 602 provides that a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Dr. Imani[']s declaration is based on his professional expertise and his interactions with the Plaintiff, which provide him with the requisite personal knowledge to testify about the matters stated in his declaration. Under Nebraska law, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Dr. Imani, as the husband of the Plaintiff, has personal knowledge of her conditions and experiences. His close relationship with the Plaintiff provides him with direct and personal insight into her neurodivergent diagnosis, PTSD, and their effects on her daily life and ability to recall events. This personal knowledge is sufficient to meet the requirements set forth by the Federal Rules of Evidence.
>
> The Defendants have not provided any evidence to demonstrate that Dr. Imani lacks personal knowledge of the matters testified to in his declaration.

Filing 114 at 4–5.

Defendants reply that Seals has not provided any evidence or case law supporting her contention that Imani's declaration is based on his professional expertise and his interactions with Seals such that he has the required personal knowledge of matters in the challenged paragraphs. Filing 118 at 5–6.

### 2.    The "Personal Knowledge" Requirements

The Court feels compelled to point out that Seals's reference to "Nebraska law" concerning admissibility of a witness's testimony is erroneous. Filing 114 at 4. Even in a diversity case, the Federal Rules of Evidence apply. *See Cont'l Res., Inc. v. Fisher*, 102 F.4th 918, 926 (8th Cir. 2024). Where—as here—the basis for jurisdiction is federal questions, there is no real doubt that the Federal Rules of Evidence apply. *See, e.g., Hanes v. Mid-Am. Petroleum, Inc.*, 577 F. Supp. 637, 644 (W.D. Mo. 1983) ("[T]he Federal Rules of Evidence will be applied in federal question cases."). However, the error about applicable law is harmless where Seals also relied on Federal Rule of Evidence 602.

Of more concern is Seals's reliance on Imani's "professional expertise" as the basis for any statements in his Declaration. Filing 114 at 4. Imani has not been designated as an expert in this case on the diagnosis of neurodivergence or PTSD or the effects of those conditions on a person's daily life or ability to recall events, nor has he demonstrated any professional qualifications that would allow him to opine on such matters. *See* Filing 114 at 4–5 (relying at least in part on Imani's "professional expertise" to establish his personal knowledge under the Federal Rule of Evidence). Thus, at most, Imani can offer "lay opinions" under Federal Rule of Evidence 701.

The Eighth Circuit Court of Appeals has explained the requirements for an affidavit or a declaration used at summary judgment as follows:

> Rule 56(c)(4) requires "[a]n affidavit or declaration used to support or oppose a motion [to] be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Although Rule 56, as amended in 2010, no longer requires a formal affidavit, an unsworn declaration or statement substituted for a sworn affidavit must still meet important statutory requirements. *See* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment. Under 28 U.S.C. § 1746, an unsworn declaration or statement must be written, signed, dated, and certified as true and correct "under penalty of perjury."

*Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016). The "personal knowledge" requirement in Rule 56(c)(4) is further explained in Federal Rule of Evidence 602. That rule provides,

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

Fed. R. Evid. 602.

The Eighth Circuit addressed how Rule 701 concerning lay opinions relates to the "personal knowledge" requirement of Rule 602 in *United States v. Espino*, 317 F.3d 788 (8th Cir. 2003). The Eighth Circuit explained,

10

Federal Rule of Evidence 602 requires that a witness have personal knowledge of the matters about which he or she testifies, except in the case of expert opinions. Federal Rule of Evidence 701 allows lay opinion that "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Rule 701 permits such testimony if it is based on "relevant historical or narrative facts that the witness has perceived," *Teen–Ed, Inc. v. Kimball Intern., Inc*., 620 F.2d 399, 403 (3rd Cir.1980), and if it "would help the factfinder determine a matter in issue," *Hurst v. United States*, 882 F.2d 306, 312 (8th Cir.1989). "While the ordinary rule confines the testimony of a lay witness to concrete facts within his knowledge or observation, the [c]ourt may rightly exercise a certain amount of latitude in permitting a witness to state his conclusions based upon common knowledge or experience." *United States v. Oliver*, 908 F.2d 260, 264 (8th Cir.1990) (citing *Batsell v. United States*, 217 F.2d 257, 262 (8th Cir.1954)). Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events. *See United States v. Peoples*, 250 F.3d 630, 641 (8th Cir.2001); *United States v. Cortez*, 935 F.2d 135, 139–40 (8th Cir.1991); *United States v. Figueroa–Lopez*, 125 F.3d 1241, 1244–45 (9th Cir.1997).

The general application of Rule 701 indicates that a lay witness may testify about facts within his or her range of generalized knowledge, experience, and perception.

*Espino*, 317 F.3d at 796–97 (footnotes omitted).

### 3.     *Numerous Challenged Paragraphs Must Be Stricken*

The Court does not find that Imani's Declaration fails to meet the statutory requirements of 28 U.S.C. § 1746, and Defendants do not argue otherwise. *Banks*, 829 F.3d at 668; Fed. R. Civ. P. 56(c)(4). On the other hand, it is clear that many of Imani's statements in his Declaration do not satisfy the principles set out in Federal Rules of Evidence 602 and 701 and Federal Rule of Civil Procedure 56(c)(4).

### a.     Imani Lacks Sufficient Personal Knowledge to Testify on Seals's Diagnoses or Their Effects but Statements Based on Observed Behavior Are Proper

The Court agrees with Defendants that Imani's declaration illustrates that he does not possess sufficient personal knowledge regarding allegations he makes pertaining to Seals's

purported diagnosis as "neurodivergent," the effect of such a diagnosis on her ability to recall events, and her purported post-traumatic stress disorder (PTSD) diagnosis. Filing 111 at 7. Again, Imani has not been designated as an expert on these matters, so that at most he can offer only "lay opinions" based on "concrete facts within his knowledge or observation" or "based upon common knowledge or experience." *Espino*, 317 F.3d at 796–97; Fed. R. Evid. 602; Fed. R. Evid. 701; Fed. R. Civ. P. 56(c)(4). Neither a diagnosis of "neurodivergence" nor a diagnosis of PTSD falls within common knowledge or experience, and lay opinions cannot "provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *Id.* at 797.

The following paragraphs of Imani's Declaration involve both some proper allegations based on personal knowledge and some improper lay opinion testimony that must be stricken. Paragraphs 10 through 12 trespass upon the zone of expert testimony and are not properly based on personal or common knowledge but are opinions on a diagnosis and the effect of that diagnosis.[1] They are stricken. These paragraphs must be contrasted with paragraph 13, which is a statement based on personal knowledge from Imani's observation of Seals's behavior in specific instances.[2] It is not stricken. A similar distinction must be drawn between challenged paragraph

---

[1] These paragraphs state the following:

  10. It is my view that if in fact these various incidents were merely fabricated, it would be unlikely for the person engaging in that conduct to maintain a consistent perspective on the nature of the incidents so many years after their occurrence.
  11. This is particularly the case for someone, like my wife[,] who is neurodivergent.
  12. One of the side effects of her set of conditions is that she is forced cognitively to retain relatively complex memories and with an attention to detail that is not often common for neurotypical individuals.

Filing 104-2 at 2 (¶¶ 10–12).

[2] Paragraph 13 states the following:

  13. I have had her approach me with details of conversations we had in the relatively distant past with accuracy and clarity that I, if pressed, would not always be able to match.

25, on the one hand, and paragraphs 27 and 32, on the other.[3] Paragraph 25 is a proper statement of personal knowledge based on Imani's personal observation of Seals, so it is not stricken. On the other hand, paragraph 27 and paragraph 32 are unsupported expert opinions about the impact of Seals's "neurodivergence" and what "anyone who knows about neurodivergent individuals" knows—where few people have knowledge of neurodivergent individuals—and paragraph 27 also invokes "common sense," which a lay juror needs no help to apply. They are stricken. The last paragraph challenged in this group, paragraph 84, presents a mixed bag of permissible observations (based on personal observation) and impermissible observations (diagnosing panic attacks and flared-up PTSD) as the basis for Seals's behavior.[4] In other words, Imani can properly testify to a first-hand observation that at a particular time, Seals "was in a rough state" and that he "was not going to leave her alone again, so [he] sat in, silently[,] on the virtual session [himself]." The rest of the paragraph is improper and must be stricken.

---

Filing 104-2 at 2 (¶ 13).

[3] These paragraphs state the following:

> 25. My answer [to why he believes Seals] is not because she is my wife but related to my factual knowledge concerning (a) the particularities of her propensity to remember things with detail for long periods with accuracy and (b) the nature of her personal character and the importance she attaches to her educational attainment trajectory.
> * * *
> 27. She would not likely be so substantially inaccurate as to tenor and content as to simply have gotten everything completely wrong in every case. That defies not only her neurodivergent "abilities," but also strains the incredulity of common sense.
> ***
> 32. Anyone who knows about neurodivergent individuals and the necessity for observers in that context as well as administrative situations that might have legal implications knows that most proceedings allow you to have representation.

Filing 104-2 at 3 (¶¶ 25, 27).

[4] Paragraph 84 states the following:

> 84. She was in a rough state, with panic attacks, anxiety, and lots of symptoms of a flared-up PTSD. I was not going to leave her alone again, so I sat in, silently on the virtual session myself.

Filing 104-2 at 10 (¶ 84).

> b. Imani Lacks Sufficient Knowledge of Conversations He Did Not Observe

Defendants assert that Imani improperly presents testimony in paragraphs 53–54, 57–64, 68–69, 71, 74–75, 78, 80, and 92–95 regarding conversations Seals had with various individuals although Imani was not present during those conversations. Filing 111 at 7. The Court agrees that all but part of one of these paragraphs must be stricken because they do not comport with Federal Rule of Evidence 602's requirements that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. For all the challenged paragraphs, Imani's own testimony is insufficient to prove personal knowledge. *Id.*

Beginning with paragraphs 53 and 54, these failings and some previously mentioned are apparent.[5] In paragraph 53 of his Declaration, Imani avers that he "was intimately aware" of a certain conversation, but he does not aver or even suggest that he witnessed that conversation. Filing 104-2 at 7 (¶ 53). Thus, whatever made him "aware" of the conversation was not his personal knowledge and observation, and this paragraph must be stricken. Fed. R. Evid. 602; *Espino*, 317 F.3d at 796–97. Imani then opines in paragraph 54 about "deficit thinking" as a "feature of all of us in society," which is an improper expert opinion outside the scope of lay experience for which he offers no basis to qualify it as an admissible lay opinion, and so this paragraph must be stricken. *Espino*, 317 F.3d at 796–97; Fed. R. Evid. 701, 702.

---

[5] In paragraphs 53 and 54 of his Declaration, Imani avers as follows:

> 53.  I was intimately aware that there had been a conversation about "deficit thinking."
> 54.  "Deficit thinking" in the context that it was employed here is a feature of all of us in a society where we are stratified by both achieved and ascribed characteristics.

Filing 104-2 at 7 (¶¶ 53–54).

Paragraphs 57 through 64 must be stricken for similar reasons.[6] Paragraph 57 plainly is not based on personal knowledge because Imani states that he has a "vivid memory" of "incidents that were related to him," *i.e.*, that were told to him by someone who actually witnessed the incidents. Filing 104-2 at 7 (¶ 57). Whatever "feeling" Imani may have about those incidents, as set out in paragraph 58, are actually opinions that are not based on personal experience or observation, so they do not qualify as competent lay opinions. Filing 104-2 at 7 (¶ 58). Thus, neither of these paragraphs meets the standards set out in *Espino*, 317 F.3d at 796–97, or Federal Rules of Evidence 701 and 702, and they must be stricken. Paragraph 59 must be stricken because it is Imani's attempt to bolster his statements with the mantle of an expert, but he has not been designated as an expert on "deconstruction of 'race' and 'ethnocentricity' and

---

[6] These paragraphs state the following:

57. Perhaps the most vivid memory I have of all the incidents that were related to me was the one about "dress".

58. It was at this point that I really became concerned and began to feel that there was some kind of pattern in which my wife's Africanity or womanhood was being juxtaposed to some standard, arbitrarily associated with "white" environments or "white" students or something like that and the training methodology involved suggested that her approach to teaching and thinking and action was supposed to be in relation to accommodation with that illusory standard.

59. As a scholar for three decades in the deconstruction of "race" an "ethnocentricity" and colonized thinking, I cannot tell you how offensive and intellectually problematic such an idea, even if implicitly suggested, is.

60. This appeared when there was a discussion directly with my spouse about dress during teaching.

61. Now there had been a general discussion about dress in class which one would have perhaps expected. You need to be comfortable but professional.

62. However, the discussion my wife had with her instructor was replete with assumptions about her body and her attractiveness to a potential audience of younger "white" men and the special steps she presumably would need to take to make sure that somehow, she did not physically divert attention from her teaching.

63. Certainly, one must dress appropriately, but the idea that my wife got "special attention" with respect to this issue was for me a bit beyond the pale.

64. And the punctuation of the narrative, where she is told that one of the reasons she has to be careful on this score has to do with making sure no presumably related issues come to Dr. Christensen in her supervisory role with respect to the TA program, was even more problematic as if the onus for whatever might happen in such a scenario would be on my wife, rather than the student who allegedly crossed some boundary.

Filing 104-2 at 7–8 (¶¶ 57–64).

colonized thinking," or any other subject, while the subjects he opines about are outside of the realm of ordinary lay experience. Paragraphs 60, 61, and 62 recount conversations or discussions that Imani does not claim to have personally witnessed, so they are outside of his personal knowledge and must be stricken. Filing 104-2 at 7 (¶¶ 60–62). Although Imani might reasonably be offended if Seals got "special attention" about her dress, as set out in paragraph 63, Imani does not state that he had personal knowledge that she got such "special attention," nor does he state that he has personal knowledge of—*i.e.*, he did not witness—what Christensen said about problems for Christensen in her supervisory role, as set out in paragraph 64. Filing 104-2 at 9 (¶ 63). Thus, paragraphs 63 and 64 must be stricken. Indeed, the statements in paragraphs 63 and 64 do no more than tell the jurors how Imani believes they should react to evidence of incidents where the evidence that such incidents occurred must have some source other than Imani. That is beyond the role of any opinion testimony, lay or expert, so these statements must be stricken. *Lee v. Andersen*, 616 F.3d 803, 809 (8th Cir. 2010) ("Opinions that 'merely tell the jury what result to reach' are not admissible." (quoting Fed. R. Evid. 704, advisory committee's note)).

Paragraphs 68, 69, and 71 must also be stricken for the same reasons as the prior group of paragraphs.[7] Filing 104-2 at 7–8 (¶¶ 68–69, 71). Again, the statements in these paragraphs do no

---

[7] These paragraphs state the following:

68. [Seals] was excited and told her instructor what she later told me about a Latino student who had said to her that this was the first time he felt validated in class in terms of his humanity and his experiences. She said to me that the instructor, rather than seeing this as a positive development, talked to her about not having had a parallel experience (irrelevant) and that she should "not let it go to her head."

69. I was simply floored in hearing this, and she presented to me a book that she had been given, "Teaching with Your Mouth Closed", a book on a pedagogical model that engages students in taking ownership of the educative moment through questions and group work and so on.
* * *

71. But the problem seemed to be that this was not being presented to her as an extension of her own work or as an outcome of a discussion about pedagogy itself, but as a response to avoiding her "getting a big head" from the student's comment.

Filing 104-2 at 7–8 (¶¶ 68–69, 71).

more than tell the jurors how Imani believes they should react to evidence of incidents even though evidence of the incidents must have some source other than Imani. That is beyond the role of any opinion testimony, lay or expert, so these statements must be stricken. *Lee*, 616 F.3d at 809.

The fundamental problem with paragraphs 74–75, 78, and 80 is readily apparent.[8] These paragraphs do not relate to matters about which Imani has any personal knowledge. Instead, he was "informed" of something; he "knows that there was a negative intervention," but does not explain how he acquired such knowledge, whether personally or through another; and he "found out subsequently" what Seals had done, but he did not witness any of Seals's conversations with "lots of students and officials." Filing 104-2 at 9 (¶¶ 74–75, 79). Paragraph 80 includes personal observations of Seals arriving at Imani's office "in tears and falling apart," which are permissible and need not be stricken. On the other hand, Imani has no personal knowledge of what precipitated Seals's state other than what she may have told him at the time, for which no hearsay exception has been identified, and Imani has no personal knowledge of the incident that precipitated Seals's state. Filing 104-2 at 9. These statements patently fail to meet the requirements of Rule 602 or Rule 56(c)(4) and must be stricken.

_____

[8] These paragraphs state the following:

74. Suddenly, I was informed that they would not be happening on the grounds that such visits might somehow be problematic for "white" students.
75. I know that there was a negative intervention with respect to her plans because I was involved with her in making connections in my own department to facilitate the occurrence.
* * *
78. I found out subsequently that she had reached out to lots of students and officials of various kinds about the situation and had been largely rebuffed. The moment of truth came after she had had such a discussion with Yuriko Doku.
* * *
80. I know that that is false because when my wife left that discussion she came directly to my office where I was and told me about it. She was in tears and falling apart.

Filing 104-2 at 9 (¶¶ 74–75, 78, 80).

The last group of challenged statements is paragraphs 92 through 95.[9] Not one of these statements explains when or how Imani had personal knowledge of what was said or what may have influenced the witnesses who allegedly changed their stories. As to the latter point, Imani offers merely naked opinions lacking any of the requirements for a properly supported lay opinion. *See* Filing 701. They must be stricken.

### 4.    Summary

Thus, with few exceptions the challenged paragraphs of Imani's Declaration are stricken. The Court will list only the exceptions. Paragraph 13 is a statement based on personal knowledge from Imani's observation of Seals's behavior in specific instances, so it is not stricken. Paragraph 25 is a proper statement of personal knowledge based on Imani's personal observation of Seals, so it is not stricken. The parts of paragraph 84 stating Imani's first-hand observation that at a particular time, Seals "was in a rough state" and that he "was not going to leave her alone again, so [he] sat in, silently[,] on the virtual session [himself]" is not stricken, although the remainder of the paragraph is stricken. Similarly, the part of paragraph 80 setting out Imani's personal observations of Seals arriving at Imani's office "in tears and falling apart" need not be stricken.

---

[9] These paragraphs state the following:

92.  Some of the witnesses sending signed statements as part of the motion for dismissal presented to this court had themselves originally related personal experiences of discrimination and mistreatment of them or of other students with which they were familiar and at times, for which they were punished in intervention.

93.  Some by the same parties, some by the same department, some in the larger university context. Some of them had originally said that they would in fact testify on behalf of my wife.

94.  Others said that they were sympathetic but would not testify out of fear. In the end some even signed statements directly contradicting certain items already in evidence as to their statements in the same impulse.

95.  All this last-minute story shifting, the omission of certain pieces of evidence and witnesses, and even the attempt to brand the entire situation as some illusion of my wife, or some malevolent agenda, or even just senseless lies, is not only false, but offensive and yet too typical when power is arrayed against truth and justice.

Filing 104-2 at 10–11 (¶¶ 92–96).

The parts of Defendants' Motion to Strike relating to all other statements in Imani's Declaration are granted.

### D. The Challenged Paragraphs and Exhibit from Cartier's Declaration

Defendants ask the Court to strike paragraphs 6 through 8 of Cartier's Declaration because Cartier was not disclosed as a potential witness. Filing 111 at 8. Defendants also ask the Court to strike Exhibit D to Cartier's Declaration because the record is devoid of any indication that Cartier has personal knowledge concerning the Exhibit. Filing 111 at 10. In his Declaration, Cartier describes Exhibit D as "a true and correct copy of excerpts from Plaintiff's medical records from her provider, Dr. Edwards that was produced to Defendants' counsel." Filing 104-3 at 2 (¶ 9).

The Court will consider these challenges in turn.

#### 1.    The Challenge to Paragraphs 6 through 8

##### a.   The Parties' Arguments

Defendants argue that Plaintiff's Amended Initial Disclosure lists only three individuals likely to have discoverable information, but Cartier is not one of them. Filing 111 at 8. Notwithstanding the failure to list Cartier as a witness, Seals now offers him as a witness where paragraphs 6 and 7 of his Declaration contain allegations related to conversations Cartier claims that he had with Alea Hall and Dr. Edwards, Seals's treating physician, and paragraph 8 is Cartier's description of Dr. Edwards's later conduct.[10] Filing 111 at 8 (citing Filing 104-3 at 1–2

---

[10] The challenged paragraphs of Cartier's Declaration state the following:

   6.   I have personal knowledge of a conversation between myself and Alea Hall where she acknowledged a situation where she had suffered recrimination in the English department because she intervened on a black student's behalf against Drs. Christensen and Bridgeford.

   7.   I also had a phone conversation with Dr. Edwards where she stated that she was fearful of going against the Defendant, Board of Regents.

(¶¶ 6–7)). Defendants argue that Seals has not offered any justification for the failure to disclose Cartier as a witness prior to submitting his Declaration in opposition to the Motion for Summary Judgment, even though Cartier was in possession of the information set out in paragraphs 6 through 8 prior to the close of discovery. Filing 111 at 9. Defendants assert prejudice from the belated disclosure because they have been deprived of the chance to depose Cartier prior to the close of discovery. Filing 111 at 9. They argue that admission of his declaration would disrupt the timely disposition of the Motion for Summary Judgment. Filing 111 at 9.[11]

Seals's entire response to this part of Defendants' Motion to Strike is the following:

> Defendants argue that these paragraphs should be stricken due to Plaintiff's failure to disclose Mr. Cartier as a witness. However, Rule 37(c)(1) sanctions may not be imposed if the failure to disclose was substantially justified or harmless *Vanderberg* at 698, 702; *Goosen v. Minn. DOT*, 105 F.4th 1034, 1037 (8th Cir. 2024). Plaintiff[']s failure to disclose Mr. Cartier was harmless as Defendants have not shown any prejudice. Additionally, the information provided by Mr. Cartier is crucial to Plaintiff's case and should be considered. Therefore, Paragraphs 6-8 of Mr. Cartier's Declaration should not be stricken.

Filing 114 at 5.

In reply, Defendants point out that Seals does not dispute that she was required to disclose Cartier as a witness pursuant to Federal Rule of Civil Procedure 26, and her contention that Defendants are not prejudiced by the failure to do so is unsupported by any evidence or case law. Filing 111 at 6.

---

8.  Dr. Edwards has since become an uncooperative witness despite being Plaintiff's treating physician and owing her a standard of care under a physician's hippocratic oath.

Filing 104-3 at 1–2 (¶¶ 6–8).

[11] Defendants also argued that Cartier was improperly attempting to serve as both an advocate and a witness in this matter. Filing 111 at 9. It was plainly improper for Cartier to attempt to appear as both an advocate and a witness in this proceeding. *See Kalina v. Fletcher*, 522 U.S. 118, 130 (1997) (explaining that "tradition, as well as the ethics of our profession, generally instruct counsel to avoid the risks associated with participating as both advocate and witness in the same proceeding"). However, the issue is now moot because Cartier was allowed to withdraw as counsel for Seals on March 4, 2025. *See* Filing 122.

b.  The Failure to Disclose Cartier as a Witness Was Improper and Was Not Harmless

In a decision cited by Seals, *Goosen v. Minnesota Department of Transportation*, 105 F.4th 1034 (8th Cir. 2024), the Eighth Circuit Court of Appeals addressed exclusion of three affidavits offered in opposition to a motion for summary judgment. 105 F.4th at 1038–39. In that case—as in this one—the offering party did not dispute that the disclosure of the affidavits was untimely. *Id.* at 1039. The Eighth Circuit explained,

> Where a party fails to disclose in a timely manner, "Rule 37(c)(1) makes exclusion of evidence the default, self-executing sanction for the failure to comply with Rule 26(a)." *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 705 (8th Cir. 2018); Fed. R. Civ. P. 37(c)(1). The Federal Rules of Civil Procedure provide exceptions to the default sanction if the failure was "substantially justified or is harmless," or on motion by the party who failed to disclose. Fed. R. Civ. P. 37(c)(1); *Vanderberg*, 906 F.3d at 705.

*Goosen*, 105 F.4th at 1039. The Eighth Circuit upheld the district court's exclusion of the affidavits where the offering party did not name the witnesses in either his disclosures or his answers to interrogatories and there was no apparent reason why the offering party had failed to identify the witnesses earlier, "especially since their testimonies were so essential to his argument." *Id.* The Eighth Circuit also agreed that the district court properly determined that if the affidavits were admitted, the opposing party would be prejudiced by the untimely disclosure "because there had been no opportunity to depose the witnesses prior to the close of discovery." *Id.*

The *Goosen* decision supports Defendants' position not Seals's. In this case as in *Goosen*, Seals does not dispute that she failed to disclose Cartier as a witness. *Id.* at 1039. Also, in this case as in *Goosen*, the Court finds it proper to exclude Cartier as a witness where he was not properly disclosed and where Seals has offered no reason for the failure to identify Cartier earlier. *Id.* Exclusion is proper for belated disclosure because of—not made excusable by—

Seals's assertion that "the information provided by Mr. Cartier is crucial to Plaintiff's case." *See* Filing 114 at 5; *see Goosen*, 105 F.4th at 1039 (explaining that exclusion of belatedly disclosed witnesses was appropriate when there was no apparent reason why the offering party had failed to identify the witnesses earlier, "especially since their testimonies were so essential to his argument"). In short, if the evidence Cartier offers is "crucial," that is a reason that Cartier should have been properly disclosed as a witness. Seals's argument that the failure to disclose was "harmless" is also unavailing where here—as in *Goosen*—the Court concludes that Defendants are prejudiced by the untimely disclosure "because there ha[s] been no opportunity to depose [Cartier] prior to the close of discovery." *Goosen*, 105 F.4th at 1039.

This part of Defendants' Motion to Strike is granted, and paragraphs 6 through 8 of Cartier's Declaration are stricken.

### 2.    *The Challenge to Exhibit D*

#### a.    The Parties' Arguments

Lastly, as to the Motion to Strike, the Court turns to Exhibit D to Cartier's Declaration, which purports to be "a true and correct copy of excerpts from Plaintiff's medical records from her provider, Dr. Edwards[,] that was produced to Defendants' counsel." Filing 104-3 at 2 (¶ 9). Defendants argue that the documentary evidence is not properly identified and authenticated by Cartier's Declaration. Filing 111 at 10. Defendants argue that the record is devoid of any indication that Cartier has personal knowledge concerning Exhibit D that would permit him to describe what it is. Filing 111 at 10.

Seals's entire argument in response to the challenge to Exhibit D is the following:

> Defendants argue that Exhibit D should be stricken because it is not properly authenticated. Federal Rule of Evidence 901(a) provides that the requirement of authentication is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. *MDU Res. Grp. v. W.R. Grace & Co.*, 14 F.3d 1274, 1275 (8th Cir. 1994); *Edwards v. Hiland Roberts*

*Dairy, Co.*, 860 F.3d 1121, 1127 (8th Cir. 2017). Mr. Cartier's Declaration states that Exhibit D is a true and correct copy of excerpts from Plaintiff's medical records. This is sufficient to meet the authentication requirement. Therefore, Exhibit D should not be stricken.

Filing 114 at 5.

In reply, Defendants argue that Seals's position is unsubstantiated. Filing 118 at 8. They then reiterate that the record is devoid of any indication that Cartier has personal knowledge concerning Exhibit D that would permit him to describe what it is. Filing 118 at 8.

> b. The Medical Records in Exhibit D May Not Be Properly Authenticated, But They Could Be Presented in Admissible Form

Pursuant to an applicable local rule concerning motion practice, "An affidavit must identify and authenticate any documents offered as evidence." NECivR 7.1(b)(2)(C). Federal Rule of Evidence 901 provides in pertinent part, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). More specifically, Rule 901(b)(1) provides that one example of evidence that satisfies the authentication requirement is "[t]estimony that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1); *see also Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) ("In light of the lack of affidavits supporting [plaintiff's] submissions, we conclude the district court neither abused its discretion nor committed any error by striking [plaintiff's] unauthenticated and inadmissible exhibits.").

The Eighth Circuit Court of Appeals does not appear to have provided clear guidance on the requirements of authentication of medical records. The district courts in this Circuit seem to take different approaches. Some have held that medical records were properly authenticated by a custodian of the records. *See, e.g., Braddock v. Banks*, No. 119CV00084DPMPSH, 2022 WL 772954, at *4 n.3 (E.D. Ark. Jan. 12, 2022), *report and recommendation adopted*, No. 1:19-CV-84-DPM, 2022 WL 757223 (E.D. Ark. Mar. 11, 2022). Another district court found that medical

records were authenticated under Federal Rule of Evidence 901(b)(1) by an affidavit of a party's counsel attesting that the exhibit was a true and correct copy of the medical records from a provider and those medical records also included a certification of medical record copy from the provider. *Stewart v. Norcold, Inc*., No. 18-CV-2114 (NEB/DTS), 2020 WL 1244787, at *5 (D. Minn. Mar. 16, 2020). At least one district court concluded that authentication of medical records was not required at the summary judgment stage because the court "assumed for purposes of summary judgment the medical records are authentic," thus assuming that the medical records ultimately could be presented in an admissible form. *See, e.g., Anderson v. Driskill*, 550 F. Supp. 3d 596, 635 (E.D. Ark. 2021); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

In this case, the only authentication offered is Seals's counsel's attestation. *Cf. Stewart*, 2020 WL 1244787, at *5 (pointing to both counsel's attestation and a certification of medical record copy). Nevertheless, each page of Exhibit D bears a UNMC Nebraska Medicine header, further identifying "NM PSYCH GEN PSYD" or "NMC PSYCHOLOGY DEPT," each with its address, an identification of Seals as the patient, and consists of the Progress Notes by Lauren T. Edwards, MD, or Adam C. Mills, PhD. *See, e.g.*, Filing 104-3 at 5–6. This information—while falling short of a certification of medical record copy—does suggest that the records are what they purport to be. The Court concludes that the appropriate course in these circumstances is for the Court to assume without deciding that the medical records in Exhibit D are authentic for purposes of summary judgment, *see Anderson*, 550 F. Supp. 3d at 635, and to assume further without deciding that they could be presented in an admissible form if necessary, *see* Fed. R. Civ. P. 56(c)(2).

Defendants' Motion to Strike is denied as to exclusion of Exhibit D to Cartier's Declaration.

### E.  Conclusions on the Motion to Strike

Defendants' Motion to Strike is granted in part and denied in part. The part of the Motion seeking exclusion of Exhibit A to Seals's Declaration is denied. With the few exceptions identified above in § II.C.4., the part of the Motion challenging paragraphs of Imani's Declaration is granted, and the challenged paragraphs are stricken. The part of Defendants' Motion challenging paragraphs 6 through 8 of Cartier's Declaration is granted, and the challenged paragraphs are stricken. Finally, the part of the Motion challenging Exhibit D to Cartier's Declaration is denied.

### III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

With the question of the record that the Court can consider now settled, the Court turns to consideration of Defendants' Motion for Summary Judgment on Seals's claims. Filing 95. The Court begins its consideration of that Motion with its statement of disputed and undisputed facts.

### A.  Factual Background

In this case, Seals's Statement of Disputed Material Facts in Opposition to Defendants' Motion for Summary Judgment, Filing 105, includes Defendants' statements of facts, Seals's responses, and Seals's statements of additional facts. Therefore, the Court will cite Filing 105 for those statements. Defendants' Reply Brief, Filing 113, includes "rebuttal" to Seals's statement of disputed material facts. Filing 13 at 6–15. Incorporating the response to Seals's statement of facts in this way does not comply with local rules. *See* NECivR 56.1(c) (requiring the moving party to "serve and file a statement of concise responses to the opposing party's statement of additional material facts, in the same form as set forth in section (b)(1)(A), above"); NECivR 56.1(b)(1)(A) (requiring "a separate statement of concise responses to the moving party's statement of material

facts"). Nevertheless, the Court will consider Defendants' responses to Seals's statement of additional facts while cautioning that the Court expects full compliance with local rules in the future. Unless otherwise indicated, the facts set out here are undisputed.

1.    *The Parties' Roles at UNO*

Denisha M. Seals, an African-American woman, was a graduate student in the English Department at UNO. Filing 32 at 2 (¶ 5). On July 22, 2021, the Board of Regents offered—and Seals accepted—a teaching assistant (TA) position for the first-year writing class in the UNO English Department. Filing 105 at 4 (¶ 18). The precise topics used for the assigned texts, classroom discussions, invention exercises, writing assignments, and essays for the first-year writing classes could vary based on the individual TA; however, the objective of the first-year writing class was to provide students opportunities to practice strategies for reading, analysis, writing, and revising. Filing 105 at 3 (¶ 14).

UNO is one of the four Administrative Units of the University of Nebraska controlled by the Board of Regents. Filing 105 at 1–2 (¶ 4). The Board of Regents employed defendant Dr. Margarette Christensen as a Senior Lecturer in the UNO English Department. Filing 105 at 1 (¶ 3). Christensen's job responsibilities included training and supervising TAs in the English Department. Filing 105 at 2 (¶ 5). At the time Seals was employed as a TA, the Chair of the English Department was Dr. Tracy Bridgeford, who is not a defendant in this action. Filing 105 at 3 (¶ 16).

2.    *Seals's Brief Employment with UNO*

Seals began working as a TA on Monday, August 9, 2021. Filing 105 at 4 (¶¶ 12, 19). Seals's employment began with a mandatory two-week training period for first-year TAs aimed at preparing the TAs for their teaching responsibilities during the fall semester. Filing 105 at 4 (¶ 19). Seals was absent because of illness for approximately one-and-a-half days during the

26

second week of TA training. Filing 105 at 4 (¶ 21). She also cancelled the class that she was teaching on Friday, August 27, 2021, during the first week of fall semester classes. Filing 105 at 4 (¶ 22). That same day, Seals resigned from her position as a TA. Filing 105 at 4 (¶ 23). At the same time Seals resigned her TA position, she also planned to submit letters of withdrawal from UNO's graduate program and associated courses. Filing 105 at 16 (¶ 84). Thus, Seals's employment, including two weeks of training, lasted only eighteen days.

### 3. Seals's Allegations of Discriminatory and Harassing Conduct During Training and Teaching

This case is unusual because relatively few of the comments or incidents at issue are set out in the parties' statements of facts, even though the comments or incidents are critical to Seals's claims and the disposition of Defendants' Motion for Summary Judgment. Instead, Defendants deny that "inappropriate" comments were made, while Seals denies their denials without setting out the contents of the allegedly inappropriate comments. See, e.g., Filing 105 at 9 (¶¶ 39–40), 12 (¶ 59), 14 (¶ 73). Seals sometimes responds that she "stands by the allegations in her complaint" that discriminatory comments and harassment did occur. See, e.g., Filing 105 at 12 (¶ 59), 14 (¶ 73). However, those responses do not point to any evidence that the comments occurred because Seals's unverified Amended Complaint is not evidence. See Wilson v. Miller, 821 F.3d 963, 970 (8th Cir. 2016). Likewise, while Seals's Declaration could be evidence, many of the paragraphs of her Declaration that Seals cites in support of her allegations that comments were made do not include the contents of the comments; instead, they refer to another declarants' denial that certain comments were made. See, e.g., Filing 105 at 9 (¶ 39) (citing Seals's Dec. at ¶¶ 134–43, 145–146), 9 (¶ 40) (citing Seals's Dec. at ¶¶ 121–24). Thus, those paragraphs are not evidence of the contents of the comments, either. Consequently, the Court has relied on Seals's recitations of comments made by others set out in her Declaration, Filing 104-1, as well as the

occasional statement of the contents of comments in the parties' statements of fact, Filing 105; Filing 113 at 6–15. Importantly, because Defendants assert broadly that no inappropriate comments or conduct occurred, the Court will treat all Seals's recitations of allegedly discriminatory or harassing comments in her Declaration as disputed. Moreover, as explained in the Introduction to this Order, the Court has assumed for the sake of argument that the statements involved were made and that the conduct involved took place as Seals alleges, despite the parties' disputes. If there is other evidence of the contents of allegedly discriminatory or harassing comments, it has not been drawn to the Court's attention.

### a. Incidents During TA Training

Seals asserts that during the two weeks of TA training, "[o]n multiple occasions [Christensen] specifically noted that comments were being made to me, because I was a 'black' student either likely teaching primarily to 'white' students or subsequently because I was 'black' and female attempting to engage the same audience." Filing 104-1 at 2 (¶ 8). The parties agree that at the end of the first week of TA training, the first-year TAs submitted "reflection papers" on their preparation to teach. Filing 105 at 28. After reviewing Seals's reflection paper, Christensen provided written feedback to Seals that included but was not limited to the following comment: "Be sure to avoid overgeneralizing your assumptions about students, even if they present as 'white.' I know you know this; I just wanted to remind you. . . ." Filing 105 at 6 (¶ 29). Seals declares,

18. When I received my graded reflection paper back, I was completely baffled by her comments. She stated. "Be sure to avoid overgeneralizing your assumptions about students, even if they present as "white." I know you know this; I just wanted to remind you."

19. I asked her in class why she wrote that comment on my paper and whether she had written the same comment on any of my peers' papers? She said, "No, I don't feel that I need to do so for obvious reasons. You are more than likely going to be the first 'black' instructor these first-year students

> have ever had, and I want to be sure they do not feel outed in any way by assumptions you will make about them."

> 20.   I told her that my reflection paper had absolutely nothing to do with race. I also stated that I was offended that she made the assumption that I would place presumptive labels on any of my students, including "white", when that would contradict my entire pedagogy.

> 21.   She said she understood and that she was just being hyper-sensitive to any student misinterpreting me as a "black" woman, which could cause problems for me later on.

Filing 104-1 at 3 (¶¶ 18–21).

Seals also declares that her "neurodivergent" status "required [her] to meet with [Christensen] after each class," which Christensen claimed "was to assure that [Seals] was successful and able to do the work," but "[n]o other student appeared to be required to do this." Filing 104-1 at 4 (¶¶ 22, 31–32). Seals also declares that the meetings with Christensen "provided the space for her to impart the various problematic statements, ideas, and actions that are central to [Seals's] complaint." Filing 104-1 at 4 (¶ 33).

During the second week of TA training, all first-year TAs including Seals were required to perform a teaching demonstration in front of the first-year TA group. Filing 105 at 8 (¶ 32). Seals chose for her demonstration an article on "white privilege." Filing 105 at 8 (¶ 36). Seals declares that Christensen "stated repeatedly that she was very uncomfortable with [Seals] having made that selection for [Seals's] own focus." Filing 104-1 at 5 (¶ 36). In addition, Seals declares,

> 37.   She preferred that I use another selection focused on a "white" basketball player who was coming into some kind of "racial" consciousness or alternatively, a piece on normativity that was ultimately selected by another student.

> 38.   She also stated that **she did not believe that first year students were mature enough to handle a discussion on white privilege coming from a "black" woman**.

Filing 104-1 at 5 (¶¶ 37–38) (emphasis in the original).

Seals declares that at a private meeting prior to the presentation, she asked Christensen not to interrupt her presentation because "[s]uch interruptions can create challenges for me as they can cause . . . overstimulation." Filing 104-1 at 5 (¶ 41). Defendants allege that Seals's teaching demonstration did not go well because Seals was not as prepared as she could have been and ultimately ran out of time, while Seals alleges that she was prepared but was repeatedly "interrupted" and "sabotaged" by Christensen. Filing 105 at 8 (¶ 37).

More specifically, Seals declares,

43.     I had begun my presentation by asking each TA to take 5 minutes to respond to some questions. "If you had to change places and live the life of someone from one of the many marginalized groups in society, do you think you could cope? Why or why not?"

44.     I was promptly interrupted by Christensen, who said that **she immediately thinks of disabled people as marginalized, not people of color**. I was going to resume explaining the writing prompt, but she interrupted me again saying, **"What if you have people of color in the class? How could they do this assigned prompt, too, so that "white" students would not feel outed?"**

45.     I attempted to continue again, this time in the case where students in my class were "nonwhite[ ]" asking whether they could cope with living as a person with privilege.

46.     Dr. Christensen THEN stated that she probably should have let me finish *before she jumped to conclusions*. Overall, she told me that she felt that this was not a "good way" to begin the semester with my students, because it could cause them to drop out of my class. She considered it a bad idea to force them to critically think early in the semester.

47.     Christensen's opening of the door to the critique that somehow my pedagogical approach was somehow existentially biased against "white" students, an inherently unfounded and meritless claim, keynoted similar assessments by my colleagues.

48.     After Christensen left the classroom for break, the other TAs stated that they agreed with her. My questions were allegedly "too deep" and unfair to students who, it was presumed, would be completely uncomfortable with the reading assignment.

49.     One classmate, following the narrative Christensen effectively started, told me that I should be cautious of coming across as only empathizing with "black, native American, and Latino students' experiences."

Filing 104-1 at 5–6 (¶¶ 43–49) (emphasis in the original); *see also* Filing 105 at 8 (¶ 37) (Seals's response citing ¶¶ 40–56 of her Declaration).

Seals declares that at her after-class meeting with Christensen after the presentation, Seals told Christensen "that [Seals] felt that [Christensen] hadn't allowed [Seals] to fully engage and teach as she did with the other TAs, and that she was avoiding her own 'deficit thinking.'" Filing 104-1 at 6 (¶ 51). As to what ensued, Seals declares,

52.     She interrupted me yet again and said that she never knew that she had her own deficit thinking **and that it was uncomfortable for her to challenge it** and she could imagine how my students would feel about this subject. . . .

53.     **She didn't want me to introduce the material to students on the grounds that she herself was uncomfortable with it.**

54.     As regards the interruptions, she apologized and stated that she simply did not remember our prior discussion.

Filing 104-1 at 6 (¶¶ 52–54) (emphasis in the original).

During TA training, at least one TA asked Christensen about UNO's dress code policy on attire for TAs when teaching class. Filing 105 at 12 (¶ 60). As Christensen had done with each TA class she had supervised, she explained that "UNO [did] not have a specific policy on how [TAs] should dress[,]" the TAs "may be just slightly older than some of [their] students, so if [the TAs] want[ed] to differentiate [themselves] from [their] students, [the TAs should] dress differently from how a student dresses, whatever that [meant] to [each individual TA.]" Filing 105 at 12 (¶ 61).

The parties dispute whether Christensen ever spoke to Seals individually about attire. Filing 105 at 13 (¶ 61). Seals declares,

60.   When I met with her later that day, she brought up the importance of **how "we" carry ourselves**. She stated that **she would recommend that I do not wear tight or form-fitting clothing because I was young and attractive.**

61.   **She theorized that an 18-year-old male first year student would spend more time looking at me then [sic] learning the material**.

62.   **She stated that she was aware that "black" women historically have been sexualized and that that would not be an issue if I made sure to follow the traditional dress code**.

63.   She also said she felt the need to tell me to make sure that I was not "personable" with my students, and did not get to know them outside of class.

64.   **She said she didn't feel the need to express this to any of the other TA's but just to me because she "didn't want an issue like that to come across her desk."**

65.   Overall, she said I uniquely needed to be mindful of how I carry myself around students. . . .

Filing 104-1 at 7 (¶¶ 60–65) (emphasis in the original).

Prior to the start of the semester, all TAs were required to prepare and submit a class syllabus to Christensen by Monday, August 16, 2021, but Seals did not submit an initial draft until Tuesday, August 17, 2021. Filing 105 at 10 (¶¶ 47–48). Seals disputes whether Christensen was "nervous" about the level of completion of Seals's syllabus. Filing 105 at 10 (¶ 49). However, Seals alleges Christensen would have known that additional time for assignments was part of Seals's "accommodations plan." Filing 105 at 10 (¶ 49). Defendants allege that while Seals received academic accommodations, Seals did not request or receive workplace accommodations in connection with her employment as a TA. Filing 113 at 11 ("rebuttal" to Seals's dispute of Filing 105 at 10 (¶ 49)). On August 19, 2021, Seals submitted a second draft of her class syllabus to Christensen, and on August 20, 2021, the last day of TA training, she submitted a third draft. Filing 105 at 11 (¶¶ 51, 53). Christensen provided Seals with feedback on her syllabus. Filing 105 at 11 (¶ 55). Seals declares that Chrisensen "told [Seals] that [Seals]

32

needed to redo the syllabus, and ultimately redid it all herself," Filing 104-1 at 9 (¶ 81), but Christensen denies both assertions. Filing 105 at 12 (¶ 56).

>    b.   Incidents During the First Week of Classes

Seals taught her first undergraduate class on Monday, August 23, 2021, then met with Christensen after the class to help Seals finalize her schedule for the remainder of the week and generally discuss her lesson plans. Filing 105 at 13 (¶¶ 63–64). Seals declares that Christensen told her at that meeting "that **she felt the need to 'micromanage' [Seals]** until [Seals] understood how [Christensen] wanted [Seals] to guide [Seals's] students." Filing 104-1 at 8 (¶ 66). During this meeting, Seals stated that she was "pleased with the way her first class went, that her students were engaged, and she felt really good about the way things went." Filing 105 at 13 (¶ 66). Seals specifically shared with Christensen that "a Latino student had told [Seals] she was the first person ever who reiterated his own lived experience and that her subjectivity would be valued[.]" Filing 105 at 13 (¶ 68). The parties dispute Christensen's reaction to this story. Filing 105 at 13–14 (¶ 67). Seals declares,

> 69.    She said, **"Well, I never had a student of color say that to me and if I were you, I wouldn't let it go to my head, let us see how he feels about you after you grade his first writing assignment."**

> 70.    I told her that I simply appreciated making someone feel validated.

> 71.    **At this point, she indicated that she had a book for me that would help prevent me from "having it go to my head" and this book was entitled "Teaching With Your Mouth Shut" by Donald Finkel.**

Filing 104-1 at 8 (¶¶ 69–71). Christensen admits that she said, "let's see how this student feels after you grade the first writing assignment, after they get the first grade," but she contends that the comment was a joking response, which Seals disputes. Filing 105 at 14 (¶ 69).

During this same meeting, Seals brought up her idea of having her first-year writing students visit various multicultural departments within UNO as part of the "normative lesson."

33

Filing 105 at 14 (¶¶ 70–71). Christensen expressed concerns that there would not be enough time in one class period for such visits. Filing 105 at 14 (¶¶ 72). The parties part company on whether any inappropriate comments occurred during this discussion. Filing 105 at 14 (¶ 73). Seals declares,

> 73. She told me she liked and appreciated where my heart was **but that [the visits to multicultural departments] would potentially make my "white" students or individuals in those departments uncomfortable**.
>
> 74. I told her that I had spoken with individuals from each of these units and that they were willing, ready, and excited to have first year students visit.
>
> 75. **She then overtly stated that she didn't want me to teach it that way, even if it's within my pedagogy because she believes that my "white" students or students that identify as "white" would feel uncomfortable and probably do not have any experiences with individuals from multicultural communities**.
>
> 76. **She told me she wanted me to teach the "Normativity" lesson in the exact way a "white" female TA in our workshop seminar presented it.** She believed that that was both **"safer" to do** and easier.

Filing 104-1 at 8–9 (¶¶ 73–76) (emphasis in the original).

Starting the first week of undergraduate classes, Seals's TA group was scheduled to meet for a seminar session every Tuesday with the first seminar scheduled on August 24, 2021. Filing 105 at 14 (¶ 74). On August 24, 2021, Seals's fiancé emailed Christensen that Seals wished to attend the class via Zoom. Filing 105 at 15 (¶ 76). Although Defendants deny that any inappropriate or discriminatory comments were made to Seals during the seminar that she attended via Zoom, Seals does not agree. Filing 105 at 15 (¶ 80). Seals declares,

> 92. A week prior to this class, Christensen assigned a reading and writing assignment, telling us to come to class prepared to discuss our perspectives. I asked my fiancé to listen in.
>
> 93. Christensen asked all the TA's their perspectives on the article **and then was preparing to dismiss the class for break without me having had an opportunity to comment**.

94.  I told her that I wanted to share my thoughts and that I had a universal question for the class.

95.  She turned the camera around to listen to me.

96.  I told her that I empathize with the professor in the article that critiqued Eurocentric standards of "proper writing" and who noted how it was imperative to develop cultural awareness of how students of color speak and write, and their reading styles.

97.  She then asked me. "Okay, so what's your question?" I had asked the people left in the classroom if we should call it English Language Writing if we want to be inclusive to all individuals.

98.  She stopped me and said**. "Denisha, what you are saying is not profound, it's nothing short of what other people of color in English departments have critiqued! Do you think you're giving us the holy "black" perspective? Because, really you're not!"** I should note that the article was actually written by someone who happened to be "white."

99.  Dr. Christensen subsequently stated that she said "wholly" rather than "holy," a reality I find at best to be a distinction without a difference because of the context in which the statement is made narratively.

Filing 104-1 at 10–11 (¶¶ 92–99) (emphasis in the original).

### 4.  Complaints and Resignation

UNO's Affirmative Action/Equal Opportunity Statement policy specifically notified Seals that if she felt she had been subjected to discrimination, she should immediately notify UNO's Compliance Officer. Filing 105 at 5 (¶ 25). Furthermore, Defendants allege that, as a Board of Regents employee, Seals understood that if she had concerns about her employment that would constitute a violation of the policies of the Board of Regents or UNO, she was to report those concerns. Filing 105 at 5 (¶ 24). Seals asserts that she did report her concerns to Dr. Bridgeford. Filing 105 at 5 (¶ 24). She declares that "I went to Dr. Bridgeford's office to complain about some class issues and the difficulties I was having in engaging with Dr. Christensen." Filing 104-1 at 13 (¶ 119). However, Seals does not declare that she

35

complained of discrimination or harassment to Dr. Bridgeford as she states in her statement of additional facts. Filing 105 at 5 (¶ 26). Seals declares further,

> 120.    It was at that time, in response to my request for help, that Dr. Bridgeford reiterated [certain] "boundary" issues . . . and said that despite the assistance she had provided to me to facilitate my admission into the program, she could not be an "ally" for me in this subsequent matter or provide her any [sic] assistance.

Filing 104-1 at 13–14 (¶ 120). It appears that this conversation is the basis for Seals's contention that she "did report concerns regarding race discrimination and harassment by Dr. Christensen but was shut down by Dr. Bridgeford." Filing 105 at 5 (¶ 26); *see also* Filing 105 at 17 (¶ 90) (alleging that Seals reported concerns about race discrimination and harassment by Christensen but was "shut down" by Dr. Bridgeford). The portions of her Declaration that Seals cites do not state that Seals reported race discrimination and harassment by Christensen to Dr. Bridgeford. Filing 104-1 at 14 (¶¶ 121–24). Seals's unsupported assertion that she reported concerns regarding race discrimination and harassment by Christensen to Dr. Bridgeford also is not responsive to Defendants' allegation of fact that "Plaintiff never reported any concerns regarding alleged race discrimination or harassment during her employment as a TA to UNO's Compliance Officer, Drew Nielsen," even if it attempts to create a fact issue about whether she reported such discrimination and harassment to Dr. Bridgeford and/or to Christensen. Filing 105 at 5 (¶ 26).

Defendants allege that Seals voluntarily resigned from employment as a TA on August 27, 2021, and that, at the time she resigned, she did not report any concerns regarding alleged discrimination or harassment during her employment as a TA. Filing 105 at 16 (¶¶ 81–82). Seals disputes those contentions by asserting that "she was constructively discharged do [sic] to the extreme effect Dr. Christensen's discriminatory and harassing behavior had on [her] health," Filing 105 at 16 (¶ 81), and that she had complained about that behavior to Dr. Bridgeford, Filing 105 at 16 (¶ 82). Seals declares, "I felt that continuing in that context would have involved an

36

endless cycle of traumatic experiences, [and] I lost 10 pounds from the stress and Dr. Edwards [a treating healthcare provider] was forced to increase the dosage of my anti-depressant medication." Filing 104-1 at 22 (¶ 199), 23 (¶ 203).

Seals's resignation letter sent by email stated the following in its entirety:

> I am writing in accordance with the requirement for the 30-day notice. I am resigning my position as a Graduate TA at the earliest possible effective date post the 30-day requirement. Please notify me of the appropriate steps to give this practical effect and to assist in the process of an orderly transition for my students over the ensuing 30 days. I will also be writing letters of withdrawal from the ADWR graduate program and the associated courses. Finally, I will be writing to notify the Writing Center of my decision.

Filing 96-4 at 122; Filing 105 at 16 (¶ 83) (referencing this letter). Because Dr. Bridgeford understood that Seals wanted her resignation to be effective as soon as possible, the English Department began a search for a replacement and soon found one. Filing 105 at 16 (¶¶ 85–86). Seals's resignation was accepted as effective August 27, 2021, and she performed no work after that date, although she was paid through September 27, 2021. Filing 105 at 17 (¶¶ 87–88).

There is no indication in the record that Christensen or Dr. Bridgeford were given prior notice of Seals's intent to resign or that they anticipated her resignation.

### 5.    Aftermath

On September 7, 2021, eleven days after resigning from her TA position, Seals emailed a letter to several individuals, including various UNO faculty members, in which she complained of alleged discrimination and harassment during her employment as a TA in UNO's English Department. Filing 105 at 17 (¶¶ 89–90). Defendants allege that this email was the first time Seals complained of alleged discrimination and harassment, although Seals again asserts that she did report discrimination and harassment by Christensen, but she was "shut down" by Dr. Bridgeford. Filing 105 at 17 (¶ 90); *see also* Filing 104-1 at 14 (¶¶ 121).

37

The Court finds it unnecessary to address either Seals's or Defendants' allegations about communications with other UNO students and faculty during Seals's brief employment with UNO. Likewise, the Court finds it unnecessary to address the parties' allegations concerning subsequent investigations of Seals's claims by UNO. Of greater importance is that on October 18, 2021, the Board of Regents received notice that Seals had filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission (NEOC). Filing 105 at 18 (¶ 95). It is also appropriate to point out that Defendants allege that prior to Seals's resignation, Christensen had already identified a number of concerns with Seals's performance, although Seals disputes "as to the number of concerns with [her] performance which were not raised by Dr. Christensen to [Seals]." Filing 105 at 18 (¶ 96); Filing 105 at 18 (¶ 97) (undisputed allegation that Christensen documented the performance issues in a written response to Seals's September 7, 2021, letter). Seals cites more than one hundred paragraphs of her declaration in support of this dispute of fact, Filing 105 at 18 (¶ 96) (citing Filing 104-1 at ¶¶ 6–108), but the Court declines to comb through such a non-specific response to determine what evidence might support the dispute. *See Nw. Bank & Tr. Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003) ("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions." (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)).

### B. Procedural Background

Seals filed this lawsuit in state court on November 7, 2022, and Defendants removed it to this Court on December 7, 2022. Filing 1. Seals's controlling pleading at this point is her Amended Complaint filed October 11, 2023. Filing 32.

In Count I of her Amended Complaint, Seals alleges a racial discrimination claim against the Board of Regents under the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev.

Stat. § 48-1101 *et seq*. Filing 32 at 15–16 (¶¶ 124–127). In Count II, she alleges a racial discrimination claim against the Board of Regents under a provision of Title VII prohibiting an employer from "limit[ing], segregat[ing], or classify[ing]" employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race. . . ."[12] Filing 32 at 16–17 (¶¶ 128–134). In Count III, Seals alleges a racially hostile educational environment claim against the Board of Regents under 42 U.S.C. § 2000d, a provision of Title VI, which provides, "No person in the United States shall, on the ground of race . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Filing 32 at 17–20 (¶¶ 129–148). In Count IV, Seals alleges a claim of deprivation of rights by a person acting under color of state law against Christensen in her personal capacity under 42 U.S.C. § 1981. Filing 32 at 20–22 (¶¶ 149–163). Finally, in Count V, Seals alleges a claim of race discrimination constituting a hostile work environment against the Board of Regents under Title VII.[13] Filing 32 at 22–24 (¶¶ 164–170).

Although this case has been on file for more than two years, the Court need not mention the various procedural mileposts along the way to the current decision. Suffice it to say that on December 2, 2024, Defendants filed the Motion for Summary Judgment on all Seals's claims that is now before the Court. Filing 95. That Motion is now fully submitted.

---

[12] Seals erroneously cites 42 U.S.C. § 2000(e)-2(m) as the basis for this claim, but there is no such statutory provision. The language she quotes at the beginning of this Count is from 42 U.S.C. § 2000e-2(a)(2).

[13] Again, Seals erroneously cites 42 U.S.C. § 2000(e)-2(m) as the basis for this claim, but the prohibition on a hostile environment under Title VII is drawn from 42 U.S.C. § 2000e-2(a)(1). *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1083 (8th Cir. 2010) ("Title VII prohibits a racially hostile work environment." (citing 42 U.S.C. § 2000e–2(a)(1))), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). 42 U.S.C. § 2000e-2(a)(1) prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ."

### C. Legal Analysis

The Court begins its legal analysis of Defendants' Motion for Summary Judgment with a summary of the standards applicable to such a motion. This course is appropriate not least because Defendants' briefing suggests fundamental misconceptions of the extent to which a nonmoving party's testimony or declarations are sufficient to defeat summary judgment.

### 1. Standards for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Liberty Ins. Corp. v. HNTB Corp.*, 87 F.4th 886, 888 (8th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) ("An issue is genuine if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." (quotations omitted)). "The court determines materiality [of facts] from the substantive law governing the claim"; thus, only "[d]isputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." *Greater St. Louis Constr. Laborers Welfare Fund v. B.F.W. Contracting, LLC*, 76 F.4th 753, 757 (8th Cir. 2023) (quoting *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998)); *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (explaining that material facts are ones "that might affect the outcome of the suit under the governing law" (internal quotations and citations omitted)).

Both the moving and the non-moving party must support their assertions about the presence or absence of genuine factual disputes "by citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, the parties otherwise bear different burdens at summary judgment.

"The movant has the initial burden of establishing the basis for the motion by identifying 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Jones v. Wellpath, LLC*, 77 F.4th 658, 662 (8th Cir. 2023) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up)). "[T]he moving party may discharge its burden by 'pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case.'" *Washington v. City of St. Louis, Missouri*, 84 F.4th 770, 773 (8th Cir. 2023) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing Fed. R. Civ. P. 56(a)). "The movant is entitled to judgment as a matter of law 'when the [non-moving party] has failed to make a sufficient showing of the existence of an essential element of [its] case.'" *Whitworth v. Kling*, 90 F.4th 1215, 1216 (8th Cir. 2024) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir. 1996)).

In response to a motion for summary judgment, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Jones*, 77 F.4th at 663 (quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)). Similarly, "[t]o create a genuine dispute of fact, 'the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff.'" *Johnson v. Midwest Div. - RBH, LLC*, 88 F.4th 731, 736 (8th Cir. 2023) (quoting. *Liberty Lobby, Inc*., 477 U.S. at 252).

Where Defendants' statement of summary judgment standards goes astray is with their assertion that Seals's allegations are unsubstantiated beyond her own self-serving statements, so that they cannot defeat summary judgment. Filing 98 at 12 (citing *Grant v. City of Blytheville, Arkansas*, 841 F.3d 767, 770 (8th Cir. 2016)). Defendants are correct that the Eighth Circuit stated in *Grant* that "the nonmoving party 'may not rely on allegations or denials' [and] [i]nstead, he must substantiate his allegations with 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Grant*, 841 F.3d at 770 (quoting *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007)). As the Court mentioned above, Seals's unsubstantiated allegations in her unverified Amended Complaint are not evidence. *See Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016). On the other hand, Seals's Declaration is evidence substantiating her allegations, because even though a "party's own testimony is often self-serving," that alone is not grounds for disregarding it entirely as the basis for a genuine issue of material fact. *Hall v. Higgins*, 77 F.4th 1171, 1182 (8th Cir. 2023) (citing *Argenyi v. Creighton Univ*., 703 F.3d 441, 446 (8th Cir. 2013)).

Similarly, Defendants go astray when they suggest that Seals cannot defeat summary judgment because her allegations regarding Christensen's conduct are contradicted by nearly every individual that Seals identified as being a witness to the alleged events. Filing 98 at 13. Other witnesses' contradiction of certain testimony "create[s] genuine issues of material fact"; it does not dispel them. *See United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn*., 480 F.3d 841, 842 (8th Cir. 2007) ("The government's motion was based in large part on testimony of interested witnesses that was contradicted, in essential respects, by

testimony of other witnesses submitted by the Church. As that conflict created genuine issues of material fact, we reverse.").

In deciding a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). On the other hand, "district courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions." *Nw. Bank & Tr. Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)). "[A]t summary judgment, it is not the role of the district court to weigh competing evidence or 'attempt to discern the truth of any factual issue.'" *Hall*, 77 F.4th at 1182 (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). "Genuine disputes of material fact are for a factfinder to resolve." *Liberty Ins. Corp.*, 87 F.4th at 889. Thus, "[s]ummary judgment is available when there is 'no genuine issue of material fact' and 'the evidence, viewed in a light most favorable to the nonmoving party, shows . . . the [moving party] is entitled to judgment as a matter of law.'" *Id.* at 888 (quoting *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1134 (8th Cir. 2020)); *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023) ("Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute [as to] those facts." *Johnson*, 88 F.4th at 736 (quoting *Torgerson*, 643 F.3d at 1042).

With these standards in mind, the Court turns to the grounds that the Court finds are dispositive of Defendants' Motion for Summary Judgment on all Seals's claims.

2.    *Seals's Claims of Race Discrimination in Employment*

In Count I of her Amended Complaint, Seals alleges racial discrimination by the Board of Regents under NFEPA. Filing 32 at 15–16 (¶¶ 124–127). In Count II, she alleges racial discrimination against the Board of Regents under Title VII. Filing 32 at 16–17 (¶¶ 128–134). In Count IV, Seals alleges deprivation of rights under 42 U.S.C. § 1981 against Christensen in her personal capacity. Filing 32 at 20–22 (¶¶ 149–163). Defendants first seek summary judgment on these three claims of race discrimination in employment. Filing 98 at 6. The Eighth Circuit has explained, "The analysis of each of these claims [of race discrimination under 42 U.S.C. § 1981, Title VII, and Nebraska Revised Statute § 48-1104(1) (NFEPA)] is identical." *Walker v. First Care Mgmt. Grp., LLC*, 27 F.4th 600, 604 (8th Cir. 2022). Therefore, the Court will consider them together.

a.    The Adverse Employment Action Requirement

Whether premised on direct or circumstantial evidence, to defeat summary judgment on her race discrimination claims, the non-movant must generate genuine issues of material fact that she suffered an adverse employment action. *See, e.g., Towery v. Mississippi Cnty. Arkansas Econ. Opportunity Comm'n, Inc.*, 1 F.4th 570, 572–73 (8th Cir. 2021). Defendants assert that Seals cannot do so here, and the Court finds this issue is dispositive of Seals's race discrimination claims.

b.    The Parties' Arguments

Defendants argue that Seals attempts to establish an adverse employment action by arguing that she was "constructively discharged" from her TA position. Filing 98 at 7. However, they argue that Seals cannot establish a constructive discharge because she did not give Defendants a reasonable opportunity to correct any allegedly intolerable working condition prior to resigning. Filing 98 at 8. Indeed, they contend that Seals did not report any concerns regarding

alleged race discrimination or harassment to any appropriate individual until eleven days after she resigned. Filing 98 at 8. Next, Defendants argue that Seals cannot establish a constructive discharge because she cannot establish that a reasonable person would have found her working conditions intolerable—even if Seals subjectively believed them to be intolerable. Filing 98 at 9– 10. Defendants also argue that Seals has not identified any evidence that she had no other choice but to resign from her TA position because she could have submitted a complaint to UNO's Compliance Officer, Dr. Bridgeford, or Christensen. Filing 98 at 10.

Seals responds that she gave Defendants a reasonable opportunity to correct the intolerable working conditions prior to her constructive discharge. Filing 107 at 7. She points to evidence that she went to Dr. Bridgeford to complain about the acts of discrimination and harassment by Christensen, but Dr. Bridgeford brushed her off. Filing 107 a 7. As to evidence of intolerable working conditions, Seals argues that her working conditions were so intolerable that her health and mental well-being rapidly deteriorated, forcing her to quit. Filing 107 at 7–8. She also argues that she has pointed to sufficient evidence of conversations and public ridicule directed at her concerning her race and dress. Filing 107 at 8.

In reply, Defendants point out that Seals's declaration states only that she "complained" to Dr. Bridgeford regarding unspecified "class issues and difficulties." Filing 113 at 16. They point out that even if Seals complained to Dr. Bridgeford about discrimination and harassment, she failed to give UNO an adequate chance to remedy the problems by failing to take advantage of reporting procedures to UNO's Compliance Officer. Filing 113 at 17.

c. Elements of a Constructive Discharge

An employee can pursue a constructive discharge claim as an adverse employment action despite her voluntary resignation. *Parker v. United States Dep't of Agric.*, No. 23-3404, 2025 WL 649898, at *5 (8th Cir. Feb. 28, 2025). However, "[t]he bar to show constructive discharge

45

is high." *Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023); *accord Parker*, 2025 WL 649898, at *5 (recognizing that the employee "has a high burden" to prove a constructive discharge). Specifically, the Eighth Circuit has explained, "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit." *Parker* 2025 WL 649898, at *5 (quoting *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007)); *Bell*, 60 F.4th at 1203 (stating the same requirements). In addition, "[a]n employee must . . . grant her employer a reasonable opportunity to correct the intolerable condition before she terminates her employment." *Bell*, 60 F.4th at 1203 (quoting *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1132 (8th Cir. 2014)).

### d. Seals Has Failed to Generate Disputes of Fact on Intolerableness of the Work Environment as Required to Prove a Constructive Discharge

"The intolerability of the working conditions is judged by an objective standard; conditions are considered intolerable 'if a reasonable employee would find them as such.'" *Lisdahl v. Mayo Found.*, 633 F.3d 712, 718 (8th Cir. 2011) (quoting *Bradford v. Norfolk Southern Corp.*, 54 F.3d 1412, 1420 (8th Cir. 1995)). Indeed, the Supreme Court itself made this point. In *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), the Supreme Court explained, "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" 542 U.S. at 141; *see also Green v. Brennan*, 578 U.S. 547, 576 (2016) (Alito, J., concurring in the judgment) ("[Whether working conditions are intolerable] is an objective standard, and what is subjectively intolerable to a particular employee may strike a court or jury as merely unpleasant." (internal citation omitted)).

46

In this case, the Court concludes that Seals has not generated a genuine issue of material fact that a reasonable person would have found her working conditions intolerable—even if Seals subjectively believed them to be intolerable. *See Parker*, 2025 WL 64898, at *5 (explaining that the first element of a constructive discharge claims is that "a reasonable person in [plaintiff's] situation would find the working conditions intolerable"); *see also Suders*, 542 U.S. 141 (explaining that this inquiry is "objective"); *Lisdahl*, 633 F.3d at 718 (same). In the Court's view—and the Court believes in the view of a reasonable jury, *see Liberty Ins. Corp.*, 87 F.4th at 888 (setting out the reasonable jury standard for summary judgment)—despite Seals's subjective impression, her circumstances were perhaps "unpleasant" but certainly not objectively intolerable, *See Green*, 578 U.S. at 576 (Alito, J., concurring in the judgment) (explaining that "what is subjectively intolerable to a particular employee may strike a court or jury as merely unpleasant").

Seals asserts that her circumstances were so intolerable that her health and mental well-being rapidly deteriorated, forcing her to quit, but that evidence points only to a subjective response. *Suders*, 542 U.S. 141 (explaining that this inquiry is "objective"); *Lisdahl*, 633 F.3d at 718 (same). Seals also asserts that she has pointed to evidence of what she calls "myriad conversations and public ridicule that was directed towards her and perpetrated by Dr. Christensen." Filing 107 at 7–8. However, the statements, set out in detail above in § III.A.3., allege that the TA training classes involved at most tense academic discussions of difficult topics related to race and perceptions, perspectives, and assumptions about race. Filing 104-1 at 5–6 (¶¶ 43–49); Filing 104-1 at 10–11 (¶¶ 92–99). They also allege what some might contend to be clumsy or misguided attempts by Christensen to mentor Seals based on concerns about how Seals would be received by students. Filing 104-1 at 3 (¶¶ 18–21); Filing 104-1 at 5

47

(¶¶ 37–38); Filing 104-1 at 6 (¶¶ 52–54); Filing 104-1 at 7 (¶¶ 60–65);[14] Filing 104-1 at 8 (¶ 66); Filing 104-1 at 8 (¶¶ 69–71); Filing 104-1 at 8–9 (¶¶ 73–76). Academic and pedagogical discussions can have their own kind of "rough-and-tumble" quality. *Cf. Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 53 (1st Cir. 2015) ("As this case illustrates, there is a certain rough-and-tumble quality to the high-stakes world of academic medicine."). Some people might contend that these alleged comments were sometimes insensitive or even offensive. However, the Court concludes that the comments did not create an objectively intolerable work environment under the law, that is, they did not make working conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign. *Suders*, 542 U.S. at 141.

Defendants are entitled to summary judgment on Seals's constructive discharge claim based on her failure to generate a genuine issue of material fact on this element. *See Witworth*, 90 F.4th at 1216 ("The movant is entitled to judgment as a matter of law 'when the [non-moving party] has failed to make a sufficient showing of the existence of an essential element of [its] case.'" (quoting *Andrews*, 98 F.3d at 1074)).

e.  Seals Has Failed to Generate Disputes of Fact that She Gave Defendants a Reasonable Opportunity to Correct the Conditions as Required to Prove a Constructive Discharge

Yet, even if Seals could generate a genuine issue of material fact on the objective intolerableness of her working environment, she has not generated a genuine issue of material fact that she gave Defendants "a reasonable opportunity to correct the intolerable condition before she terminate[d] her employment." *Bell*, 60 F.4th at 1203 (quoting *Rester*, 739 F.3d at

---

[14] Assuming that Christensen's purported private comments to Seals about proper attire were made, they are perhaps the most offensive ones, but they are no so offensive as to make Seals's workplace intolerable.

1132). As to this requirement of a constructive discharge, "[p]art of an employee's obligation to be reasonable . . . is an obligation not to assume the worst, and not to jump to conclusions too fast." *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017) (quoting *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010)). Specifically, an employee must not "jump to the conclusion that [an] attempt [to report the condition] would not work and that her only reasonable option was to resign." *Id.* (quoting *Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 76p (8th Cir. 2014)).

Seals contends that she "did report concerns regarding race discrimination and harassment by Dr. Christensen but was shut down by Dr. Bridgeford." Filing 105 at 5 (¶ 26); *see also* Filing 105 at 17 (¶ 90) (alleging that Seals reported concerns about race discrimination and harassment by Christensen but was "shut down" by Dr. Bridgeford). As the Court observed above in § III.A.4., the portions of Seals's Declaration that she cites do not state that Seals reported race discrimination and harassment by Christensen to Dr. Bridgeford. Filing 104-1 at 14 (¶¶ 121–24). Instead, Seals declares, "Subsequently, I went to Dr. Bridgeford's office to complain about some class issues and the difficulties I was having in engaging with Dr. Christensen." Filing 104-1 at 13 (¶ 119). Seals's assertion that she reported concerns regarding race discrimination and harassment by Christensen to Dr. Bridgeford thus is unsupported by any evidence, so that it does not generate a genuine issue of material fact that she made such a report. *See Jones*, 77 F.4th at 663 ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." (quoting *Thomas*, 483 F.3d at 527)). Seals has also failed to support any dispute with Defendants' allegation of fact that "Plaintiff never reported any

concerns regarding alleged race discrimination or harassment during her employment as a TA to UNO's Compliance Officer, Drew Nielsen." Filing 104 at 5 (¶ 26).

Furthermore, no reasonable jury could find that Seals met her "obligation to be reasonable," this is, "not to assume the worst, and not to jump to conclusions too fast." *Blake*, 870 F.3d at 826 (quoting *Alvarez*, 626 F.3d at 419). Even if Seals reported discrimination and harassment by Christensen to Dr. Bridgeford but was "shutdown," Seals improperly "jump[ed] to the conclusion that [any further] attempt [to report the intolerable condition] would not work and that her only reasonable option was to resign." *Id.* Seals never followed UNO policy by reporting any concerns regarding alleged race discrimination or harassment during her employment as a TA to UNO's Compliance Officer, Drew Nielsen, before quitting. Filing 104 at 5 (¶ 26).

Seals's failure to generate a genuine issues of material fact on whether she gave UNO a reasonable chance to address the allegedly intolerable condition, *Bell*, 60 F.4th at 1203, means that Defendants are entitled to summary judgment on her assertion of constructive discharge. *See Witworth*, 90 F.4th at 1216 ("The movant is entitled to judgment as a matter of law 'when the [non-moving party] has failed to make a sufficient showing of the existence of an essential element of [its] case.'" (quoting *Andrews*, 98 F.3d at 1074)).

f.  Summary

Because Seals has failed to generate genuine issues of material fact on the challenged elements of a constructive discharge claim, she has also failed to generate a genuine issues of material fact on the adverse employment element of her race discrimination claims pursuant to NFEPA, Title VII, and 42 U.S.C. § 1981. *See, e.g., Towery,* 1 F.4th at 572–73 (explaining that to defeat summary judgment on race discrimination claims under NFEPA, Title VII, and 42 U.S.C. § 1981, the non-movant must generate genuine issues of material fact that she suffered an adverse employment action). Consequently, the Court need not address Defendants' further

arguments for summary judgment on Counts I, II, and IV.[15] Summary judgment shall enter in favor of Defendants on Counts I, II, and IV of Seals's Amended Complaint.

### 3. Seals's Claims of a Racially Hostile Environment in Education and Employment

In Count III of her Amended Complaint, Seals alleges a racially hostile educational environment against the Board of Regents under 42 U.S.C. § 2000d, Filing 32 at 17–20 (¶¶ 129–148). The statute on which this claim is based provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Defendants state, "For purposes of this Motion, Defendants do not dispute [the Board of Regents] is subject to Title VI's requirements." Filing 98 at 21 n.4. In Count V, Seals alleges race discrimination constituting a hostile work environment against the Board of Regents under 42 U.S.C. § 2000e-2(a)(1). Filing 32 at 22–24 (¶¶ 164–170); see Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1083 (8th Cir. 2010) ("Title VII prohibits a racially hostile work environment." (citing 42 U.S.C. § 2000e–2(a)(1))), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011). 42 U.S.C. § 2000e-2(a)(1) prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." Defendants seek summary judgment on both claims.

---

[15] Those arguments are that Seals cannot generate genuine issues of material fact that Defendants intended to force Seals to resign, Filing 98 at 11; that Seals has no direct evidence of discrimination, Filing 98 at 11–13; that Seals cannot generate genuine issues of material fact on her race discrimination claims with circumstantial evidence, Filing 98 at 13–19; and that Christensen is entitled qualified immunity to Seals's § 1981 claim in Count IV, Filing 98 at 19–21.

a. The Parties' Arguments

Defendants seek summary judgment on these claims on the grounds that Seals cannot show that she was subjected to unwelcome harassment because of her race, Filing 98 at 22, and that she cannot show that any purported harassment affected a term, condition, or privilege of employment, Filing 98 at 23. As to the first challenge, Defendants argue that Seals offers no evidence that she was subjected to unwelcome harassment because of her race. Filing 98 at 22. As to the second challenge, Defendants argue that the work environment must be objectively offensive, but it was not. Filing 98 at 23. They argue that even if Seals could prove that the comments and conduct upon which she bases her hostile work/educational environment claims occurred—which they dispute—such comments and conduct cannot credibly be characterized as "severe or pervasive" enough to support her claims. Filing 98 at 24. They contend that the alleged conduct by Christensen does not involve racial slurs, threats, or other racially derogatory language and, at worst, involved discussions of how students may react to Seals and how she should interact with them based on racial differences and assumptions. Filing 98 at 25.

Seals responds that she has submitted both direct and circumstantial evidence that supports her account of the events creating a hostile work and educational environment. Filing 107 at 14. As to Defendants' argument about the lack of severity of the treatment, Seals "welcomes this Court to examine the facts presented and make that determination whether the treatment [she] was subjected to was offensive or not." Filing 107 at 14–15. Consequently, she argues that her claims of hostile educational/work environment under Title VI and Title VII, respectively, should not be dismissed. Filing 107 at 15.

In reply, Defendants argue that Seals asks the Court to conduct a "search-and-rescue mission" to salvage her hostile environment claims, but the Court is not required to take on such an obligation at summary judgment. Filing 113 at 22.

52

b.  Defendants' "Unwelcome Harassment" Argument Is Unavailing

In support of their first ground for summary judgment on the hostile environment claims, Defendants' argument in somewhat more detail is that Seals offers only unsubstantiated and self-serving statements, so that there is no evidence that Seals was subjected to unwelcome harassment because of her race. Filing 98 at 22. Thus, the gravamen of Defendants' argument is not whether any harassment was unwelcome, but whether there is any evidence of harassment. Again, Seals's unsubstantiated allegations in her unverified Amended Complaint are not evidence. *See Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016). On the other hand, Seals's Declaration is evidence substantiating her allegations of allegedly harassing conduct and comments, because even though a "party's own testimony is often self-serving," that alone is not grounds for disregarding it entirely as the basis for a genuine issue of material fact. *Hall v. Higgins*, 77 F.4th 1171, 1182 (8th Cir. 2023) (citing *Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013)). Defendants are not entitled to summary judgment on these claims on the ground that Seals has no evidence of alleged harassment.

c.  Seals Has Failed to Generate a Genuine Dispute of Fact on the Severity of the Hostile Environment

Defendants stand on better ground with their argument that Seals cannot show that any purported harassment was sufficiently severe. Filing 98 at 23. Both Seals's hostile educational environment claim and her hostile work environment claim require proof *inter alia* that harassment was so severe, pervasive, and objectively offensive that it deprived the plaintiff of equal access to educational opportunities or affected the terms and conditions of their employment, respectively. *Compare e.g., Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507, 521 (4th Cir. 2025) (Title VI harassment case explaining that the racial harassment must be "was so severe, pervasive, and objectively offensive that it deprived [the plaintiff] of

equal access to the educational opportunities); *B.W. by M.W. v. Austin Indep. Sch. Dist.*, 121 F.4th 1066, 1072 (5th Cir. 2024) (same); *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 808 (7th Cir. 2021) (same); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014); *with, e.g., Parker v. United States Dep't of Agric.*, No. 23-3404, 2025 WL 649898, at *4 (8th Cir. Feb. 28, 2025) (Title VII racial harassment case explaining that "there must be evidence that the harassment was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" (quoting *Watson v. McDonough*, 996 F.3d 850, 856 (8th Cir. 2021), in turn quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (alterations in the original)).

The Eighth Circuit has explained,

> In determining whether a hostile work environment existed, all circumstances of [the employee's] employment must be considered, "including the frequency of the offending conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with work performance."

*Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 965 (8th Cir. 2023) (quoting *Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 629 (8th Cir. 2005), *reh'g denied*, No. 22-2592, 2023 WL 6313679 (8th Cir. Sept. 28, 2023)). The Court deems these considerations to be equally applicable to a Title VI hostile educational environment claim.

For essentially the same reasons the Court concluded in § III.C.2.d. that Seals could not generate genuine issues of material fact that her working conditions were intolerable for the purpose of establishing a constructive discharge the Court now concludes that she cannot generate genuine issues of material fact that the work or educational environment was sufficiently hostile. The statements, set out in detail above in § III.A.3., allege that the TA training classes involved at most tense academic discussions of difficult topics related to race and perceptions, perspectives, and assumptions about race. Filing 104-1 at 5–6 (¶¶ 43–49); Filing

104-1 at 10–11 (¶¶ 92–99). They do not show physically threatening or humiliating comments sufficient to interfere with Seals's educational opportunities or work environment. *See Yang*, 79 F.4th at 965 (identifying these considerations). They also allege sometimes clumsy or even misguided attempts by Christensen to mentor Seals based on concerns about how Seals might be received by students. Filing 104-1 at 3 (¶¶ 18–21); Filing 104-1 at 5 (¶¶ 37–38); Filing 104-1 at 6 (¶¶ 52–54); Filing 104-1 at 7 (¶¶ 60–65);[16] Filing 104-1 at 8 (¶ 66); Filing 104-1 at 8 (¶¶ 69–71); Filing 104-1 at 8–9 (¶¶ 73–76). Again, academic and pedagogical discussions can have their own kind of "rough-and-tumble" quality. *Cf. Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 53 (1st Cir. 2015) ("As this case illustrates, there is a certain rough-and-tumble quality to the high-stakes world of academic medicine."). Being challenged about one's presumptions and perspectives can be frustrating, but such challenges do not rise to the level of humiliating. As Defendants point out, there is no evidence of racial slurs, threats, or other racially derogatory language and, at worst, the comments involved discussions of how students may react to Seals and how she should interact with them based on racial differences and assumptions. Filing 98 at 25. Finally, even if the comments in question were frequent where they all occurred in an eighteen-day period, they fall far short of the required severity, even considered together. *See Yang*, 79 F.4th at 965 (identifying frequency of harassing conduct as a factor and requiring consideration of all the circumstances).

---

[16] Again, assuming that Christensen's purported private comments to Seals about proper attire were made, they are perhaps the most offensive ones, but they are not so severe or pervasive as to make Seals's work or educational environment hostile.

Thus, Defendants are entitled to summary judgment on the racially hostile environment claims in Counts III and V on the ground that Seals has failed to generate genuine issues of material fact that the alleged harassment was sufficiently severe.[17]

### IV. CONCLUSION

Upon the foregoing,

IT IS ORDERED that

1.      Defendants' Motion to Strike, Filing 109, is granted in part and denied in part, as follows:

---

[17] Although it has played no part in the Court's disposition of the Motion for Summary Judgment—which is based on the evidence of conduct on the record in this case—the Court notes that Seals has made allegations about discrimination and harassment based on race against another employer and medical providers that are remarkably similar to allegations that she now makes against the Board of Regents and Christensen. Specifically, the following facts are undisputed:

> 139. [S]ome of Plaintiff's allegations related to her perceived treatment by third parties mirror the exact allegations upon which Plaintiff bases her claims against Defendants. Specifically, following Plaintiff's termination from employment with Benson Library, Plaintiff asserted that her supervisor communicated different expectations for the way Plaintiff should dress as opposed to other employees.
> 140. Plaintiff further asserted that her supervisor at Benson Library commented on Plaintiff's "wide vocabulary," similar to how Plaintiff alleges in this case that Dr. Christensen commented on her "wide vocabulary."
> 141. Plaintiff has also accused one of her previous medical providers of being "mean and disrespectful and abrasive" after the provider became frustrated at Plaintiff's questions "just like [Dr. Christensen]."
> 142. Plaintiff has accused another previous medical provider of "racial bias" based, in part, on Plaintiff's impression that the provider "felt that it was [Plaintiff's] job to teach her, kind of like what Alea [Hall] said, stay in this program and teach people to humanize you, and I told her I will not do that."

Filing 105 at 26–27 (¶¶ 139–142) (citations to evidence omitted).

Furthermore, based on consideration of the evidence in this case, the following is also undisputed:

> 134. The NEOC ultimately dismissed Plaintiff's Charge [giving rise to this case] on August 18, 2022, finding that, "[t]he evidence fail[ed] to support the allegations of discrimination[.]"
> 135. The NEOC's Determination further found there was no evidence that Plaintiff was subjected "to less favorable terms and conditions of employment," and "no evidence [Plaintiff's] work environment was so poisoned as to compel an individual to resign their position," noting that "[e]ven if everything [Plaintiff] alleges is true, it would not rise to the level of severe or pervasive."
> 136. The EEOC adopted the NEOC's determination and similarly dismissed Plaintiff's Charge.

Filing 105 at 26 (¶¶ 134–136) (citations to evidence omitted).

a.      The part of the Motion seeking exclusion of Exhibit A to Seals's Declaration is denied;

b.      With the few exceptions identified above in § II.C.4., the part of the Motion challenging paragraphs of Imani's Declaration is granted, and the challenged paragraphs are stricken;

c.      The part of the Motion challenging paragraphs 6 through 8 of Cartier's Declaration is granted and the challenged paragraphs are stricken; and

d.      The part of the Motion challenging Exhibit D to Cartier's Declaration is denied.

2.      Defendants' Motion for Summary Judgment, Filing 95, is granted on all of Seals's claims on the grounds stated above.

Dated this 31st day of March, 2025.

BY THE COURT:

Brian C. Buescher
United States District Judge